IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 10, 2002

## STATE OF TENNESSEE v. JESSIE JONES

**Appeal from the Criminal Court for Shelby County**
**No. 00-08290    W. Fred Alxey, Judge**

_____

**No. W2001-02774-CCA-R3-CD - Filed February 4, 2003**

_____

The defendant, Jessie Jones, appeals as of right his conviction by a Shelby County jury of attempted second degree murder, a Class B felony. The trial court sentenced him as a Range II, multiple offender to twenty years in the Department of Correction. The defendant contends (1) that the trial court should have instructed the jury on self-defense and (2) that attempted second degree murder is not an offense in Tennessee. Although we hold that attempted second degree murder is an offense, we reverse the conviction because the failure to instruct on self-defense is plain error. We remand the case to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

A C Wharton, Jr., District Public Defender; W. Mark Ward, Assistant Public Defender (on appeal); and Timothy J. Albers, Assistant Public Defender (at trial), for the appellant, Jessie Jones.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and William D. Bond, III, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arises out of the May 11, 2000 shooting of Johnny Graham in his car outside of Brother's Barbeque in Memphis, Tennessee. The victim testified that the defendant and the defendant's friends would "hang out" in front of the house of his friend Ricky Caldwell at 803 Merton Street. He said that he and the defendant were not friends and that the defendant would make derogatory comments to him whenever he came to visit Mr. Caldwell. He said that although he believed that the defendant was jealous of him, he did not initially suspect that the defendant wanted to harm him.

The victim testified that about one month before May 11, 2000, he bought an Omni that was parked on the street in front of Mr. Caldwell's house. He said he had been repairing the car and was returning Mr. Caldwell's tools when he encountered the defendant on the sidewalk. He said the defendant, who looked enraged, hurled a child's bicycle at his face as hard as he could. He said both of his hands were full, and he ducked to avoid the bicycle. He said he went into Mr. Caldwell's house and began calling his mother to come get him. He said that two to three minutes later, the defendant came into the house holding a revolver and said, "I'm fixing to blow your ass off." He said the defendant clicked the pistol twice, but it did not fire. He said he was afraid. He said the defendant ran out the door, shot out both of the Omni's driver's side windows, and disappeared.

The victim testified that he called the police, told them the defendant's name, gave a description, and pointed out the defendant's friends. He said that the police could not locate the defendant despite questioning the defendant's friends and that they told him they could not do anything until the defendant shot him. He said that he thought the police took a report and that he told the police he wanted something done because he did not feel safe anymore. The victim said that at that point, he decided to stay away from Mr. Caldwell's house. He said he had no contact with the defendant until May 11. He said that he bought a black 1987 Nissan Maxima within a week of May 11 and that around 10:00 a.m. on May 11, he was taking his fiancé Sharron Perkins to apply for some jobs. He said he decided to stop by Brother's Barbeque on Jackson Avenue to show the Maxima to Mr. Caldwell because the restaurant was one of Mr. Caldwell's favorite gambling spots. He said he drove down Merton on the way to Brother's Barbeque but did not see anyone outside.

The victim testified that he left Ms. Perkins in the car while he checked whether Mr. Caldwell was inside Brother's Barbeque. He said he went inside, waved to Mr. Caldwell, then went to get Ms. Perkins. He said that on the way out, he met an acquaintance and talked with him about the Maxima. He said the sunroof was open on the Maxima, and all of the windows were down. He said he got into the car, began raising the windows, and told Ms. Perkins to go inside. He said that the driver's side door was open and that the defendant stepped inside the door next to him. He said that the defendant said, "Get your mother f***ing ass out of that car" and that when he turned toward the defendant, he was looking into the barrel of a smaller caliber version of a Tech-9, which was less than two inches from him. He said that he told Ms. Perkins to get help and that he did not have a gun. He said that the defendant ordered him out of the car again but that he did not get out because he was afraid and did not want to get shot in the back. He said the defendant shot him in the lower extremities. He said that Ms. Perkins had left the passenger's side door opened and that he could hear her telling the defendant not to shoot him. He said he believed he tried to escape the defendant by going across to the passenger's side. He remembered nothing else of the attack.

The victim testified that he was taken to the Regional Medical Center where he underwent twelve surgeries within thirty days. He said that he was dead upon arrival at the hospital and that after he was taken off life support, the surgeon told him that he had been shot seventeen times. At the time of trial, the victim had a colostomy bag and an open stomach wound covered by a skin graft. He said that one of his testicles had been shot off and that he had baseball-sized tumors in his genital

area.  His femur had been shattered, and he had a two-and-one-half-foot steel rod in his leg.  Another rod extended down through his buttock.  He was partially paralyzed and required a custom-made leg-piece.  He had limited use of his legs and could not walk unassisted.  He had limited use of one arm and poor circulation resulting from being shot in the elbow.  He continued to require pain medication.

The victim admitted that he pled guilty to felonious possession of a controlled substance and said that he had acquired this charge before he was shot.  He said he also had a May 14, 1998 conviction for possession of a controlled substance with intent to manufacture, deliver, or sell.  He said he was charged with possession of a prohibited weapon on June 6, 1996, and admitted being involved with drugs.  He denied having a dispute with the defendant over drugs and said he did not know why the defendant did not want him in the neighborhood.  He said the defendant's girlfriend liked the victim's younger brother, he had once given her his brother's telephone number, and she had called his brother.  He wondered if the defendant suspected that his girlfriend liked the victim.

Sharron Perkins testified that the victim was her ex-boyfriend and that she was in his black Nissan Maxima with him when he was attacked on May 11, 2000.  They stopped at Brother's Barbeque, but she did not go inside with the victim.  The victim was gone about three minutes, and when he returned, they sat in the car discussing a clicking noise the car was making.  She said that she glanced to the side and saw the defendant standing over the sunroof pointing a short machine gun down.  She said the victim had not noticed the defendant, and she told the victim to look.  She said the victim turned, looked up, and asked the defendant what he was doing.  She said that the defendant ordered the victim out of the car but that the victim remained in the car.  She said the defendant started shooting down toward the floor of the car.

Ms. Perkins testified that fearing for her life, she ran to the restaurant's door and asked to be let inside.  She said she was hysterical and covered her ears to block out the shooting.  She said that the door was opened after a couple of minutes and that she asked for help but that no one would go outside.  She said she ran outside to find the defendant shooting the victim through the opened passenger's side door.  She said the victim was on the floor of the car with his feet hanging outside.  She said that she asked the defendant not to shoot the victim anymore, that the defendant shot the victim three more times, and that the defendant turned and looked at her before walking away.  She said that she was not injured but that the next day, she discovered a hole in her purse, which had been in the Maxima's floorboard under the victim's head.  She said that a bottle of nail polish had burst inside the purse and that papers inside the purse contained holes.

Although Ms. Perkins identified the defendant from a photograph array following the shooting, she testified at trial that she was not sure she saw the shooter in the courtroom but that the defendant looked similar to the shooter.  On cross-examination, she said that a couple of minutes elapsed between her telling the victim to look at the defendant and the shots being fired.  She said the victim told her that in March or April 2000, a man in a wheelchair urinated by a car under which the victim was working while at his friend's house.  She said he told her that he told the man that he was under the car and not to urinate there.  She said the victim also said the defendant chased him

into a house, clicked a gun at him twice, and then shot out the victim's car window. She said that she did not know whether the defendant's actions were connected to the incident with the man in the wheelchair. She said that the victim did not have a gun on May 11, 2000, and that she had never known him to carry a gun. She admitted that she did not know about the victim's conviction for carrying a weapon.

Ricky Caldwell testified that he and the defendant had been neighbors growing up and that he had been friends with the victim ten to fifteen years. He said the defendant and the victim met at one of his houses and did not get along from the time they met. He said the defendant did not want the victim in the neighborhood and thought that the victim was interested in the neighborhood girls. He said that about three weeks before the shooting, the victim was working under a car on the street in front of Mr. Caldwell's house. He said one of the defendant's friends urinated on the car in front of the spot where the victim was working. He said the victim told the man not to urinate there but did not threaten the man. He said he saw the man talking with the defendant. He said he had heard that the defendant pulled a gun on the victim who ran into the house. He said he saw the defendant shoot out all of victim's car windows with a pistol. He said that about two weeks before the May 11 shooting, the victim came to his house and the defendant told the victim he was going to kill him. He said the defendant told him to keep the victim away from his house because the defendant was going to kill the victim.

Mr. Caldwell testified that on May 11, 2000, he had breakfast at Brother's Barbeque around 9:00 a.m. and that he saw the defendant there ordering breakfast. He said he later saw the defendant outside with his gang. He said the victim came to the back of the restaurant and talked with him for ten or fifteen minutes. He said the victim went outside and had been gone about ten minutes when he heard a knocking sound like someone was throwing rocks at a window. He said he and the other customers went to the door where he saw the defendant walking across Jackson Avenue. He said that a hysterical woman came into the restaurant and that he and the restaurant owner immediately followed her out. He said he went to the victim's car and laid him on the ground. He said a nurse arrived, instructed everyone to move away, and aided the victim. On cross-examination, he said that before May 11, he had not seen the victim in almost thirty days and that the victim showed up at Brother's Barbeque unexpectedly. He admitted that he had been incarcerated for a drug offense.

Willie D. Fields, Jr. testified that he worked for the City of Memphis Sign Department and that on May 11, 2000, he was replacing a sign when he witnessed a shooting about five hundred feet away on Jackson Avenue. He said he heard a noise and then saw a man shooting into a Nissan Maxima through the top. He said he descended the ladder, called his coworkers, and told them to call the police. He said he hid behind his truck until the shooting stopped. He said he went to the Maxima and saw the victim lying between the door and the car as if he were trying to get out. He described the shooter as dark complected with a jheri curl or wearing a hood.

Ivy Harrison testified that she was driving away from the beauty shop on Jackson Avenue on the morning of May 11, 2000, when she heard a noise like a car backfiring. She said that the noise grew louder as she drove west and that she saw a man shooting into the open passenger's side

-4-

door of a Maxima. She said she saw a man's foot under the door as if the man were stepping from the car. She said she was so nervous that she veered into the opposite lane and stopped for a minute before turning in a lot and driving east on Jackson. She said the shooter held his gun down, passed in front of her truck at a light jog, and went between some houses. On cross-examination, she said that she probably had the radio playing and that she was afraid.

Detective Russell of the Memphis Police Department (MPD) testified that on May 11, 2000, he was working as a patrol officer and responded to a call of shots fired and one person down at 2500 Jackson Avenue. He and his partner Officer Browning were the first officers on the scene and arrived five minutes after receiving the call. He saw a small crowd around a Nissan Maxima. The victim was partially on the passenger's side armrest with his head and shoulders between the seats and appeared to have been coming from the driver's seat into the passenger's seat. He had multiple gunshot wounds to his lower extremities, and a nurse was administering first aid. Detective Russell said that he saw over twenty bullet casings on the ground and that he believed the shooter had fired through the sunroof. He said based upon his training with automatic weapons in the military and on the police force, he believed if a person shot with an automatic weapon through a sunroof, the shells would be ejected out and down on the side of the car on which the shooter was shooting. He said the police found no weapons at the scene.

Sergeant Donald Wright of the MPD testified that on May 11, 2000, he was a crime scene officer and arrived at the scene at 2500 Jackson Avenue about thirty minutes to one hour after the responding officers called him. He said that he found twenty-seven spent shell casings around the victim's car, seven of which were on the driver's side. He said he found a pool of blood on the ground near the passenger's side door. He said no weapons were found on the scene. On cross-examination, he said the wind was blowing the shell casings around a bit. He said that the sunroof and the driver's side window were open but that the other windows were closed.

Amy Griffith, the custodian of medical records at the Regional Medical Center of Memphis, testified about the victim's medical records. When the victim arrived at the hospital, the emergency room's trauma staff classified him as a possible impending death and rated his condition at transfer as critical. He had multiple gunshot wounds to his extremities and pelvis. He was in the hospital for thirty-three days, went to the operating room seven times, and underwent thirty-two surgical procedures. He received 103 units of blood or blood components over four days.

Officer Jeffrey Antonio Burns, Sr., a patrolman with the MPD, testified that around 6:00 p.m. on April 13, 2000, he responded to a call at 803 Merton Street. He said the victim reported that a black male had entered the house, attempted to fire a pistol at him, and then shot the windows out of his car. The victim said the perpetrator's name was Jed or Jessie and described his clothing and ball cap. Officer Burns said that he did not find the perpetrator and that no one was arrested in connection with the complaint.

Melachi Thompson testified that he was confined to a wheelchair after being hit by a car and paralyzed in 1988. He said that he grew up with the defendant who was like a brother to him. He

said that in April 2000, he was on the corner of Lyndale and Merton Streets beginning to empty the liter bag, which collects his urine, into a bottle. He said the victim, who was repairing his car, called Mr. Thompson derogatory names and told Mr. Thompson to get away from him. He said that the victim also threatened to kill someone and that he took this threat seriously although it was not directed to anyone in particular. He said he told the defendant the victim was telling him where he could and could not urinate. He said that the defendant and victim did not respect each other and began arguing, calling each other derogatory names, and threatening to beat or kill each other. He said that neither the defendant nor the victim had a weapon and that he left after the argument began. On cross-examination, he acknowledged pleading guilty to possession of a controlled substance with intent to manufacture, deliver, or sell on March 24, 1998. He admitted that he knew the victim was under the car but said that if he did not empty his liter bag, it would have burst. He said he was not at Brother's Barbeque on May 11, 2000.

Mary Catherine Stafford, the defendant's mother, testified that on May 10, 2000, the defendant spent the night at her house. She said that around 9:45 a.m. the next day, she dropped him off on Jackson Avenue near Merton Street. She said that she did not know if the defendant had a weapon that day but that she had never seen him with a gun and did not know of him owning one.

The defendant testified that he was acquainted with the victim who came to the neighborhood of Merton Street and Jackson Avenue to sell drugs. He said that Ricky Caldwell rented a crack house at 803 Merton where everyone hung out and that the victim began coming to Mr. Caldwell's house regularly to sell drugs to Mr. Caldwell. The defendant said that he and his friends sold drugs in front of 803 Merton and that he started selling drugs there in 1997 or 1998. He said that the victim saw that 803 Merton was a profitable location but that the victim and Ricky Caldwell were not able to sell their drugs because the defendant was selling drugs right outside the house. He said he and the victim had an ongoing dispute because the victim had told him he could not sell drugs on Merton. He said the victim and Mr. Caldwell would often call the police about him. He said he felt threatened and disrespected by an outsider like the victim telling him that he could not sell drugs in the neighborhood where he grew up.

The defendant testified that in early January 2000, he sold drugs to a customer that the victim was trying to wave over. He said that he told the victim not to sell drugs in his neighborhood and that the victim called him a derogatory name. He said that in February 2000, he and the victim found themselves in jail on the same night. He said that the victim believed he had been set up by Melachi Thompson throwing drugs under a car and that the victim threatened to get him and to run over Mr. Thompson. He said that in late March or early April 2000, he and the victim exchanged threats. He said that the victim ran into Mr. Caldwell's house and that he assumed the victim was going to call the police. He said he followed the victim, opened the door, and saw the victim on the telephone. He said he walked to the victim's car and broke the window with a small .38 caliber revolver because he was upset about the victim constantly threatening to beat or kill him. He said the gun went off and shot into the car's floorboard.

The defendant testified that also in April 2000, Mr. Thompson told him the victim had called Mr. Thompson derogatory names and threatened to kill Mr. Thompson. He said that he told the victim that the victim was not going to do anything to Mr. Thompson and that the victim should pick on someone his own size who was not handicapped. He said he and the victim began arguing, the victim called him derogatory names and threatened to kill him, and he then threatened to "kick [the victim's] ass." He said the victim ran into a house.

The defendant testified that in late April or early May, he came out of 803 Merton and was about to get into the backseat of a friend's car when the victim and two other men pulled up in a Suzuki Sidekick. He said that the victim pointed a revolver at his face and that another man in the Suzuki had a sawed-off shotgun. He said the victim said that he ought to kill the defendant but that he would wait until later. He said the occupants of the Suzuki drove away laughing. He said he feared for his life but did not call the police because that was not how one handled business on the street. He said he next saw the victim on May 10, 2000. He said he went to a pay telephone on the corner of Merton and Jackson to answer his beeper when the victim pulled up in a black Maxima. He said the victim lowered the car window, pointed a gun, said he ought to kill the defendant, and then drove off.

The defendant testified that on the morning of May 11, 2000, his mother dropped him off on the corner of Jackson and Merton on her way to work. He said he went to a garage behind 803 Merton and retrieved his Tech-22, which he had hidden in a tire. He said he got this gun through a drug deal in early May because the victim had been threatening him with a gun. He said it was a fully automatic weapon that would fire continuously as long as the trigger was depressed. He said he made sure the gun was loaded, put a bullet in the chamber, cocked the gun, and concealed it under his shirt. He said he went to Brother's Barbeque, ordered, and took his breakfast outside to eat. He said he saw Mr. Caldwell in the back of the restaurant playing the gambling machine. He said he went to the end of the block between a beauty shop and the junkyard and smoked "blunts" with some friends. He said he saw the victim drive down Jackson and back his car into the restaurant parking lot. He said that he did not expect to see the victim that morning and that he said, "I can't believe this mother f***er just pulled a gun on me and he's still coming around like–like I'm a bitch."

The defendant testified that after the victim went inside the restaurant, he noticed a female passenger in the victim's car. He said that the victim got back into the car, that the driver's side window and the sunroof were open, and that the victim was talking to the woman. He said he approached the car from the rear of the driver's side and stood by the sunroof. He said that the woman noticed him and was startled and that the victim noticed him after the woman jumped. He said he told the victim "you need to get out of the mother f***ing car" and that they needed to come to an understanding before the situation escalated. He said he did not have his gun out at this time. He said the victim reached between the seats, and the woman began saying, "No, no, no." He said that he opened the driver's side door and that the victim's hand was on a gun. He said that the woman jumped out of the car and that he shot the victim in the legs around fourteen times through the driver's side door. He said the victim jumped out the open passenger's side door and then crawled back in like he was reaching under the seat to get his pistol. The defendant said he ran

-7-

around the back of the car and shot the victim five or six times in the buttocks because he believed the victim was still trying to shoot him. The defendant explained that although he did not want to kill the victim, he felt he had to cripple him in order to prevent the victim from sneaking up on him and shooting him in the future. He said he stopped shooting and jogged lightly across Jackson. He said he dumped his gun in a garbage can and caught a ride from a friend.

The defendant acknowledged pleading guilty to making a false offense report on October 13, 1994; sale of a controlled substance on July 14, 1997; and attempted possession of a controlled substance with intent to sell or deliver on December 9, 1997. He said he had recently pled guilty to driving while a habitual motor vehicle offender. On cross-examination, he admitted that he was not allowed to own a gun of any type. He said that he wore a cap on May 11 although he did not usually wear one. He said that after he ordered the victim out of the car, the victim said that he was not getting out and for the defendant to "do what you got to do." He said that when he opened the victim's door, the victim had his hand on a gun but did not have a chance to shoot the defendant with it. He said that he did not know what happened to that gun. He denied shooting the victim through the sunroof. He acknowledged that the driver's side seat was leaned back in the photographs of the crime scene but said the victim was not leaning back. He estimated that the episode lasted two or three minutes.

Based upon this evidence, the jury convicted the defendant of the lesser included offense of attempted second degree murder.

## I. INSTRUCTION ON SELF-DEFENSE

The defendant contends that the trial court committed plain error by refusing to instruct the jury on self-defense. He argues that viewing the evidence in the light most favorable to him, at the time of the shooting, he was trying to resolve his conflict with the victim peacefully when the victim reached for a gun. He asserts that the error is of constitutional magnitude because it infringed upon his right to present a defense. The state contends that the defendant has waived this issue by failing to include it in his motion for a new trial. It also argues that the defendant was not entitled to a self-defense instruction because he was the first aggressor and created the situation in which he felt the need to defend himself. We agree with the defendant that the failure to instruct on self-defense constitutes plain error.

At the hearing on the jury charge, the defendant asked the court to instruct the jury on self-defense, and the court declined finding that the proof did not support a self-defense instruction:

> [Defense Counsel]: What about Self Defense, Judge?
>
> THE COURT: Well, who's the aggressor?
>
> [Defense Counsel]: Based on his testimony that he had been threatened.

-8-

THE COURT: I know what you're saying. You have to look at who the aggressor is. What did Mr. Graham do after Mr. Jones places himself on that parking lot and is approaching the car? What did Mr. Graham do to create a fear in Mr. Jones' mind that he had to take some action to save his own life other than his self-serving testimony, which I must consider?

[Defense Counsel]: Yes, sir.

THE COURT: That he saw him reach for a gun. The door wasn't open at that time. The door wasn't open so if you're reaching for a gun–have you ever heard of people riding slick? Do you know what that means?

[Defense Counsel]: No, Sir.

THE COURT: That's when they lay the seat back to where you just can't hardly see over the steering wheel and that's the way you drive. And if he was riding slick and it was shot–and the shots were as the witness with the City of Memphis says, nothing but his lower extremities were exposed.

I cannot bring myself to charge Self Defense. The elements are just simply not there. And right now the law is, as I understand it, . . . [i]f the proof is not there, don't charge it.

The defendant did not raise this issue in his motion for new trial nor did he include a copy of his proposed self-defense instruction in the record on appeal.

Initially, we note that an issue predicated on a trial court's refusal to give a requested instruction is waived unless the issue was first specifically raised in a motion for new trial. T.R.A.P. 3(e). The defendant contends that the lack of a self-defense instruction constitutes plain error on the record. Our supreme court has held that "a trial court judge's failure to give a jury charge on matters characterized as 'fundamental' may be found to be error requiring reversal" even if the defendant did not request the omitted instructions. State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994). In Tennessee, the law of self-defense is fundamental to a case when the evidence fairly raises it as an issue. See Myers v. State, 185 Tenn. 264, 268, 206 S.W.2d 30, 32 (1947). Because we believe that a jury instruction which failed to charge self-defense fairly raised by the evidence would substantially affect the defendant's rights, we will address the merits of this issue in order to do substantial justice. See Tenn. R. Crim. P. 52(b).

To determine whether self-defense is fairly raised by the proof and must be instructed to the jury, "a court must, in effect, consider the evidence in the light most favorable to the defendant,

including drawing all reasonable inferences flowing from that evidence." State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). A person is justified in using force against another person when he or she reasonably believes (1) that death or serious bodily injury is imminent and (2) that the force used is immediately necessary to protect against the other person's use or attempted use of unlawful force. Tenn. Code Ann. § 39-11-611(a). On the other hand, a person is not justified in using or threatening force against another if he or she provoked the other person's use or attempted use of unlawful force unless (1) he or she "abandons the encounter or clearly communicates to the other the intent to do so," and (2) the other person still persists in using unlawful force. Tenn. Code Ann. § 39-11-611(d)(1)-(2).

Taken in the light most favorable to the defendant, the evidence in the present case reflects that the defendant, with his weapon concealed, approached the unsuspecting victim and ordered him out of his car in order to resolve the situation between them. The defendant testified that he saw the victim reaching for a weapon and that he opened the driver's side door. He said that he saw the victim's hand on a gun and began shooting. The trial court apparently based its rejection of the instruction upon its belief that the defendant could not have seen the victim reach for a gun with the car door shut and the victim leaned back in his seat. With all due respect to the experienced trial court, this analysis fails to consider the evidence in the light most favorable to the defendant, who testified that he saw the victim reach for a gun. Additionally, the defendant testified that the victim was not leaning back in his seat even if the seat was reclined.

The state contends that the defendant is not entitled to a self-defense instruction even if the victim did reach for a gun because the defendant provoked the victim's threat of force by approaching the victim's car armed with a Tech-22 and ordering the victim out of the car. In the light most favorable to the defendant, the Tech-22 was concealed beneath his clothing until after the victim reached for a gun. We do not believe the defendant's ordering the victim out of his car warranted the victim responding with deadly force. The failure to instruct on self-defense constitutes plain error as it violates the defendant's substantial rights. Thus, we reverse the conviction and remand the case for a new trial.

## II. ATTEMPTED SECOND DEGREE MURDER

The defendant also contends that the offense of attempted second degree murder is a legal impossibility because the intent requirements of the attempt statute cannot be combined with the knowing mental state required for second degree murder. He argues that this case is analogous to State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996), in which our supreme court held that attempted felony murder is not an offense because one cannot intend to commit a reckless act. Although he acknowledges that this court has rejected this argument on many occasions, he presents no new argument for a different outcome but states that he is merely preserving the issue in the event of an appeal to the supreme court. The state contends that attempted second degree murder is not impossible. We agree with the state and continue to hold that attempted second degree murder is an offense in Tennessee.

-10-

The criminal attempt statute requires a specific intent. Tenn. Code Ann. § 39-12-101[1]; Kimbrough, 924 S.W.2d at 980. Second degree murder, on the other hand, requires a knowing mental state. Tenn. Code Ann. § 39-13-210. This court has held that the mental states required by attempt and second degree murder are not inconsistent as both "'involve a level of conscious awareness and volitional, affirmative conduct.'" State v. Palmer, 10 S.W.3d 638, 644 (Tenn. Crim. App. 1999) (quoting State v. Dale Nolan, No. 01C01-9511-CC-00387, Sequatchie County, slip op. at 19 n.9 (Tenn. Crim. App. June 26, 1997), app. denied (Tenn. Mar. 2, 1998)). Thus, "the intent to commit a knowing act is neither logically nor legally impossible," and attempted second degree murder is an offense. Id.

Our supreme court has recently held that the intent requirement of the criminal attempt statute is not incompatible with lesser mental states because "no single mental state applies to all of the elements of the attempted crime." State v. Mateyko, 53 S.W.3d 666, 675 (Tenn. 2001) (holding that attempted child neglect is an offense). Thus, the state must prove that the defendant acted with specific intent with regard to the elements of the crime that relate to the defendant engaging in certain conduct or causing a particular result. Id. With regard to the elements that do not involve the nature or result of the defendant's conduct, the state must show the defendant acted with the mens rea required by the crime itself. Id. In dicta, the court examined the interaction of the intent requirement of attempt and a lesser mental state required by a result-of-conduct offense, such as second degree murder:

---

[1]Tenn. Code Ann. § 39-12-101 defines criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

> [R]esult-of-conduct offenses otherwise requiring a non-intentional mental state may be attempted even if the defendant did not consciously desire for the proscribed result to occur. Taking second degree murder as one such example, it is clear that the defendant does not have to "intend" that death occur, at least not in the sense that the victim's death is the defendant's conscious objective or desire. Instead, so long as the State shows that the defendant *believed* that death would follow from his or her conduct, criminal attempt liability may be imposed.

Id. at 676 n.6. Relying upon the quoted rationale, the court specifically approved the result reached in Palmer. Mateyko, 53 S.W.3d at 676 n.6. The attempt to commit second degree murder is a valid offense in Tennessee.

Based upon the foregoing and the record as a whole, we reverse the judgment of conviction and remand the case to the trial court for a new trial on the offense of attempted second degree murder.

_____
JOSEPH M. TIPTON, JUDGE