IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 4, 2003

## STATE OF TENNESSEE v. WILLIAM WILSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-05479, -05480    Joseph B. Dailey, Judge**

_____

**No. W2001-02601-CCA-R3-CD  - Filed October 22, 2003**

_____

On May 19, 2001, a jury in Memphis convicted the defendant, William Wilson, of aggravated robbery and first degree felony murder.  The trial court sentenced him as a Range I Standard Offender to life in prison for the first degree felony murder conviction and to eight (8) years for the aggravated robbery to be served consecutively.  The defendant appeals these convictions.  He argues four issues on appeal: (1) He was not criminally responsible for his co-defendant's actions, and therefore, not guilty of first degree murder; (2) the evidence was insufficient to support his convictions for aggravated robbery and first degree murder; (3) the trial court erred by failing to charge the affirmative defense of duress; and (4) the trial court erred by sentencing him to eight (8) years consecutive to his life sentence with the possibility of parole.  We affirm the trial court's actions with regard to these issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA McGEE OGLE, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, William Wilson.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; William L. Gibbons, District Attorney General; Jennifer Nichols and Glen Baity, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### Factual Background

Hubert Benson arrived at the Ebony and Lace strip club around 1:00 a.m.  His wife worked at the club, so he was known to the bouncers and security guards at the club.  His wife was not working that night, but the bouncers told him about a dice game that was in progress on the side of the club.  Mr. Benson often gambled there.  The participants at the dice game were, Mr. Benson, two

security guards, the bouncer and Chico McCracken, the co-defendant. Mr. Benson was winning as the game progressed. There was $160 in the pot, when Mr. Benson's roll, which was in his favor, hit someone's hand or foot. Mr. McCracken became very upset and told Mr. Benson that he did not lose that way. During this exchange, the security guards and the bouncer returned to the club. At this point, William Wilson, the defendant and Mr. McCracken's half-brother, walked out of the club and wandered around the parking lot near the dice game. Mr. McCracken ordered the defendant to go get the car. At this point, Mr. McCracken and Mr. Benson were alone at the side of the club. Mr. McCracken then pulled out a gun and pointed it at Mr. Benson. He told Mr. Benson to give up his money. He then fired a shot in the air. Mr. Benson threw down what he had in his hands, including his winnings. Mr. McCracken told him to give him the rest of his money. Mr. Benson had $1200-$1300 in his pocket to pay his rent and car note for the month. When Mr. Benson refused, Mr. McCracken shot between his feet. Mr. Benson then threw down the rest of his money. The defendant had arrived with the car about this time. While holding the gun on Mr. Benson, Mr. McCracken ordered the defendant to get out of the car and pick up the money. The defendant did as he was told and returned to the car. Mr. McCracken jumped in the car, and the two men drove off.

Mr. Benson then asked for help from the security guards and bouncers. When they told him they could not help, he jumped in his car to follow the defendant and co-defendant. He was able to catch up to them and called 911 to report the robbery and where the defendants were. The defendants turned off their lights and led Mr. Benson on a chase which reached speeds of up to 90 miles an hour. Mr. Benson remained on the line with the 911 operator continually giving them the location of the defendants. Officer John Robinson was the first Memphis police officer to catch up to the chase. He was soon joined by Officer Robert Wilkie in his patrol car. The officers all had their lights and sirens on. Although the defendants slowed down to around 50 or 60 miles an hour, they did not stop for the police. Officer David Royal and Officer John Chevalier, who were riding in a two-man car, joined the chase from their precinct when they heard on the police radio that the defendants had pointed a gun at Officer Robinson. Officer Robinson was directly behind the defendants followed by Officer Wilkie and Officers Royal and Chevalier in that order.

While the defendants were in the left-hand lane, Officer Robinson attempted to pass them in the right-hand lane. Officer Wilkie remained behind the defendants and Officers Royal and Chevalier were behind Officer Robinson. When Officer Robinson was almost past the defendants' car, they suddenly swerved to the right and hit the left rear of Officer Robinson's car with the right front of their car. The defendants' car hit the guardrail twice before coming to a stop. Officer Robinson's patrol car started going sideways and spun out of control. The car went off of the road and hit two or three trees before it came to rest. When the officers reached Officer Robinson's car, he was pinned in the car, gasping for breath, with his eyes wide open and unresponsive. He was taken to the hospital where he died. The defendant and co-defendant were arrested at the scene.

The Shelby County trial court tried the defendant and co-defendant from May 14, 2001 to May 19, 2001. After deliberating for an hour and forty-five minutes, the jury convicted both men of aggravated robbery and first degree felony murder. The trial court sentenced each one to life

imprisonment, as required by state law, for the first degree felony murder convictions. At a later sentencing hearing on August 23, 2001, the trial court sentenced the defendant to eight (8) years to run consecutive to his life sentence and Mr. McCracken to twelve (12) years to run consecutive to his life sentence both as Range I offenders. The defendant now appeals his conviction and sentence to this Court.

## Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

## Sufficiency-Aggravated Robbery

The defendant first argues that he should not have been held criminally responsible for the actions of Mr. McCracken leading to a conviction of aggravated robbery and, subsequently, first degree felony murder. This issue is essentially a challenge of the sufficiency of the evidence to convict the defendant of aggravated robbery, so we address it with the defendant's challenge of the sufficiency of the evidence to support his conviction for aggravated robbery.

Pursuant to Tennessee Code Annotated section 39-13-401, robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear.
Aggravated robbery is robbery that is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402. An individual can be held criminally responsible and charged with the commission of an offense "if the offense is committed by the person's own conduct, by the conduct

of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401.  There are several ways an individual can be found to be criminally responsible:

> (1) Acting with culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402.

The undisputed facts at trial, testified to by Mr. Benson, were that the defendant appeared at the beginning of the argument between Mr. Benson and Mr. McCracken.  Mr. McCracken told the defendant to go get the car.  When the defendant returned with the car, Mr. McCracken was pointing a gun at Mr. Benson and money lay on the ground.  Mr. McCracken told the defendant to pick up the money that Mr. Benson had thrown on the ground.  The defendant got out of the car, picked up the money, and returned to the car.  Mr. McCracken then jumped in the car, and the defendant drove out of the parking lot.  Mr. Benson got in his car and began to pursue them.  The defendant turned off his headlights and led Mr. Benson on a high-speed chase through the streets of Memphis.

The bouncer corroborated some of Mr. Benson's testimony.  He testified that there was a dice game and that a dispute occurred between Mr. Benson and Mr. McCracken.  He returned to the club and paged the defendant.  He stated when he returned to the door of the club, he heard two shots coming from the direction of Mr. Benson and Mr. McCracken.  Then he saw the defendant picking up money off of the ground.  After the defendant returned to the car, the bouncer saw Mr. McCracken get in the car, and they drove away.

The defendant argues that he cannot be held criminally responsible for co-defendant's actions, and therefore, guilty of aggravated robbery.  He bases these arguments on the facts that he did not know that Mr. McCracken was planning to rob Mr. Benson, he was not present during the gambling between Mr. Benson and Mr. McCracken, and that the only reason he picked up the money is because Mr. McCracken told him to do so.  However, as stated above, the state can prove that the defendant was criminally responsible despite these facts.  We have stated that to prove criminal responsibility:

> It is necessary that the defendant "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." Hembree v. State, 546 S.W.2d 235, 239

(Tenn. Crim. App. 1976). The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994). In addition, our Supreme Court has held that the criminal responsibility statute is derived from common law principles including that of aiders and abettors. State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997). In State v. Hembree, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982), we stated:

> The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he is guilty of aiding and abetting; and it has also been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. 22 C.J.S. Criminal Law § 88(2) pages 266-267.

It is clear that the defendant's conduct meets the requirements of criminal intent as set out above. The defendant saw Mr. McCracken pointing a gun at Mr. Benson. He picked up the money Mr. Benson threw on the ground and got into the car. In addition, the defendant drove the car in which they fled the scene, evading both Mr. Benson and the police. He clearly acted "with intent to promote or assist the commission of the offense" and aided in the completion of the aggravated robbery by collecting the money and driving the car. It is indisputable that he "knowingly, voluntarily and with common intent unite[d] with the principal offenders in the commission of the crime." Also, he was present during the commission of the offense and drove the car to evade capture. Under Hembree, his intent to join in the offense can be inferred from these actions. Therefore, he is criminally responsible for the acts of Mr. McCracken.

The defendant also questions whether there was sufficient evidence to convict him of aggravated robbery. We have already decided the evidence was adequate to hold him criminally responsible due to his assistance to Mr. McCracken during the robbery. We now turn to whether there was sufficient evidence to prove aggravated robbery.

As stated above, Mr. Benson's testimony is undisputed. Mr. McCracken pointed a gun at Mr. Benson and demanded his money. Mr. Benson threw his money on the ground, and the defendant picked it up, got in the car, and he drove the defendant from the scene.

These facts clearly meet the requirements to prove aggravated robbery. The defendant and Mr. McCracken took the money by putting Mr. Benson in fear by using a deadly weapon, the gun.

We conclude that the evidence when viewed in the light most favorable to the state is sufficient for a rational jury to find that an aggravated robbery occurred and that the defendant was criminally responsible for the aggravated robbery beyond a reasonable doubt. Therefore, this issue is without merit.

**Sufficiency-First Degree Murder**

The defendant's second issue is that the evidence was insufficient to convict him of first degree murder. Under Tennessee Code Annotated § 39-13-202(a)(2), first degree murder is defined as "a killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." We have already held above that there is sufficient evidence to find that the defendant was criminally responsible for Mr. McCracken's aggravated robbery of Mr. Benson. We do not need to find that the defendant intended to kill Officer Robinson to uphold his conviction for first degree murder. Tennessee Code Annotated section 39-13-202(b) states, "no culpable mental state is required for conviction under (a)(2) . . .except the intent to commit the enumerated offenses or acts . . . ." Therefore, if there is sufficient evidence to prove that the death of Officer Robinson occurred during the perpetration of the robbery, the defendant can also be convicted for first degree murder.

The facts in State v. Lee, 969 S.W.2d 414 (Tenn. Crim. App. 1997), are very similar to the facts in the case sub judice. In Lee, the defendant robbed a pharmacy of various narcotics. He left the pharmacy in a white truck. The driver of the truck then let the defendant out in a parking lot where he got in a brown Ford. The police obtained the description of the brown Ford from the driver of the white truck. Twenty-five minutes later, the police saw the brown Ford. A high speed chase ensued. The defendant struck a police car, erratically cut in front of other motorist and slammed on his brakes causing an officer to run into the back of him. The chase ended when the defendant swerved into the oncoming lane of traffic and ran head-on into an on coming vehicle. The driver of the vehicle and the defendant's passenger were both killed as a result of the accident. Lee, 969 S.W.2d at 416. The defendant in Lee argued that he did not kill the victim during the perpetration of the robbery. This Court held that the killing happened during the perpetration of the robbery. Id. The Court stated:

> We find that a rational trier of fact could find, and indeed did find, that the homicide occurred in furtherance of the robbery. Nothing in the record indicates that the appellant had reached a place of temporary safety. The homicide was clearly a result of the high-speed chase necessitated by the appellant's attempt to flee the area of the crime. It is a legitimate and logical assumption that one who plans a robbery and carries it out has also planned to escape from the scene of the crime. His flight is an integral part of the crime. Since asportation is an element of robbery, the felony is still in progress while the defendant is fleeing from the scene with the stolen property.

Id. at 416-17.

Our supreme court has held that the temporary safety test is one of the most important factors when deciding whether a death has occurred during the perpetration of a felony. State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000). The supreme court stated:

One of the most important factors to consider in determining whether there has been a break in the chain of events that would preclude application of the felony murder rule is whether the felon has reached a place of temporary safety. See LaFave & Scott, Substantive Criminal Law, § 7.5(f)(1). If the felon has gained a place of temporary safety after commission of the felony and before the killing, the felony murder rule generally does not apply.

Id.

There was a great deal of testimony concerning the aftermath of the robbery. The State presented the owner of the car, Mr. Benson, many dispatchers from the Memphis police department, the police officers that were involved in the chase, various officers in charge of collecting evidence, an accident reconstructionist and the medical examiner for Shelby County.

The first person to testify was the owner of the car. She stated that Mr. McCracken had driven her to work that day. After dropping her off, he was to take the car to the shop because the car pulled to the left. However, she did not have any problems keeping control of the car. But, as the car went faster, the pulling would get worse. The night of the incident, she had gotten her car from the shop, but returned it and left the key under the mat. That is the last time she saw it until after the defendants were involved in the crash.

Mr. Benson testified that after the robbery, he asked the bouncers and security guards for help. When they told him they were unable to help him, he jumped into his car and began to follow the defendants. He called 911 and reported the robbery. He continued to follow the defendants, who had now turned off their lights, while remaining on the phone with the police dispatchers to report the defendants' location. The chase reached speeds of up to 90 miles an hour. At some point, Mr. Benson saw an officer coming towards him and flagged him down. That officer made a u-turn and began to follow the defendants. The officer was Officer Robinson. Mr. Benson continued to follow behind all the police officers. He followed them until all the cars came to a stop. He did not see the wreck.

The dispatchers all testified that they received a call concerning a robbery and a fleeing suspect. They corroborated Mr. Benson's testimony that he was following the defendants and relaying their location. There were several dispatchers involved because the dispatchers each cover a certain territory, and the chase occurred in more than one territory. One of the dispatchers testified Officer Robinson reported that the defendants pointed a gun at him during the chase.

Officer Robert Wilkie testified that the dispatcher put out a call about a robbery victim chasing a robbery suspect. He caught up with the chase after Officer Robinson was already in pursuit. Officer Robinson was one or two car lengths behind the defendants, who did not have their lights on, and Officer Wilkie was one or two car lengths behind Officer Robinson. He estimated the defendants' speed at around 60 miles an hour. He said that Officer Robinson pulled into the right hand lane while the defendants were in the left hand lane. Officer Wilkie said that the defendants

suddenly braked and immediately jerked to the right, hitting Officer Robinson's car. Officer Robinson's car went to the right, then the left, then spun out of control. Officer Robinson's car went off the road and hit some trees before coming to rest. The defendants' car hit the left guardrail and came to a stop. Officer Wilkie immediately arrested the driver of the car, the defendant. He testified that there was money all over the floorboard of the defendants' car.

Officers David Royal and John Chevalier were in a two man car the night Officer Robinson died. They both testified at trial. They were just finishing some paperwork at the precinct at the end of their shift when they heard Officer Robinson on the radio. Officer Robinson said he was following the suspects from a robbery. When they heard Officer Robinson say the defendants had pointed a gun at him, they decided to join the chase because the cars were near the precinct. Officer Chevalier threw the keys to Officer Royal who drove the car. They caught up to the chase and got behind the second police car driven by Office Wilkie. Officer Chevalier testified that they were going between 50 and 60 miles an hour and that the officers all had on their lights and sirens. When Officer Robinson got into right lane, Officers Royal and Chevalier got behind him. Both officers saw the defendants swerve into Officer Robinson's car. The swerve appeared to be intentional. There was no evidence that the defendants were having trouble controlling the car up until the swerve. Officer Robinson's car went out of control and off of the road. The defendants hit the left guardrail and came to a stop. Officer Chevalier threw the shotgun to Officer Royal who ran toward the defendants' car and held the gun on the passenger, Mr. McCracken.

Officer Royal ran to Officer Robinson's car. He was the first officer to the car. He said Officer Robinson's car buckled around a tree. The driver's side of the car was pushed in and the window was broken. The car had collapsed around Officer Robinson. Officer Chevalier could tell that Officer Robinson's situation was very grave because his head was rolled back, his arm was broken, his eyes were rolled back in his head and he was gasping for breath. Officer Robinson's body had movement in it, but he was unresponsive. After other officers had taken the defendants into custody, Officer Royal went to Officer Robinson's car. Officer Royal attempted to get Officer Robinson's seatbelt off to help him breathe. He testified that Officer Robinson was in bad condition and was not conscious.

Officer Kenneth Frazier also participated in chase. He was behind the other officers and was unable to get to the crash scene because of the other police cars and the debris. He reported that there was an officer trapped and called for an ambulance.

Other officers and police department employees testified about taking photographs of the crash scene and gathering evidence. Officer Daniel Parris testified that he collected $636 from the floorboard on the driver's side, $220 from the floorboard on the passenger's side and $877 in the passenger's seat, but could not locate a weapon. Officer Dana Stine accompanied Mr. Benson to the Ebony and Lace club and collected five recent spent shell casings and 3 handgun cartridges.

Officer Robin Beach of the Michigan State Police also testified at trial. The Memphis Police Department called him to do an accident reconstruction. During his research and testing, he

concluded that the defendants did not have their lights on at the time of the accident. Also, the physical evidence on the left rear of the police car and the right front of the defendant's car indicated a purposeful right turn by the defendants into Officer Robinson's car.

The defendants were still committing the aggravated robbery when Officer Robinson's car ran off the road. The defendants had not reached a place of temporary safety. They were still in the midst of fleeing the robbery. Immediately after they robbed Mr. Benson, he began to chase them through the streets of Memphis. They turned off their lights and drove up to 90 miles an hour. It can be inferred from these actions that they believed they were being pursued. The officers then joined the chase. The officers' sirens and lights were running the entire time, but the defendants still did not pull over. The defendants did not stop until they ran into Officer Robinson and hit the guardrail. There was not a break in the chain of events between the robbery and the incident that led to Officer Robinson's death. The defendants never reached a place of temporary safety. The defendants killed Officer Robinson while perpetrating the aggravated robbery of Mr. Benson.

For these reasons, we conclude that the evidence when viewed in the light most favorable to the State is sufficient for a rational jury to find the defendant guilty of first degree felony murder. Therefore, this issue is without merit.

**Duress Defense**

The defendant's next issue is that the trial court erred when it failed to include the defense of duress in the jury instruction. The defendant argues that he was under duress because if he had not followed Mr. McCracken's orders either he or Mr. Benson would have been harmed. The State argues that there was no evidence to support this instruction. The trial court has a duty to "give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). However, the jury instruction must be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). Erroneous jury instructions require a reversal, unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586 (Tenn. Crim. App. 1992).

The standard to allow inclusion of a statutory defense in the jury instructions is found in both caselaw and the statutes. The test to determine whether a trial court should have given a special instruction is whether "there is any evidence which reasonable minds could accept" to support such an instruction. Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). Under Tennessee Code Annotated section 39-11-203(c), the existence of the defense must be fairly raised by the proof if the defense is to be submitted to the jury. For a statutory defense to be fairly raised by the proof "a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence," because the trial courts and appellate courts

must avoid judging the credibility of the witnesses when making this determination. <u>State v. Shropshire</u>, 874 S.W.2d 634 (Tenn. Crim. App. 1994).

The trial court stated the following with regard to instructing on a duress defense:

[A]s I recall the proof, at least, Mr. Benson said that Mr. Wilson had left to get the car before Mr. McCracken pulled the gun out, which would suggest that he didn't realize that there was robbery going on until he had gotten back around with the car.

Certainly, at that point, he realized it. There's his half brother, Mr. McCracken standing there with a gun pointed at Mr. Benson and money on the ground that wasn't there before - - a lot of money on the ground that wasn't there before. And then he's told to pick up the money, and he gets out and picks up the money and gets back in the car before McCracken gets back in the car and does nothing - - I don't remember any proof to suggest that Mr. Wilson was under any duress - - felt that he was under any duress - - made any effort to extricate himself from the scene or from the situation - - to step on the accelerator when he got back in the car, knowing that Mr. McCracken hadn't yet gotten into the car.

In fact, when the car was ultimately stopped by that guardrail in North Memphis, there was money on both sides - - both floorboards. The police found money on both floorboards.

It wasn't as though he then had handed it all over to McCracken. Everything points to a joint effort from the point that the car was brought around to the point that the car was ultimately stopped. And the suggestion that he was so concerned about Mr. Benson that he - - that the duress would apply to the third person, Mr. Benson - - that he was doing that only to save Mr. Benson's neck, I think, is really a stretch and unsupported by any proof at all.

I just don't think that there's any evidence, at all, that would support the charge of duress in this case given the proof that's been presented. I mean I guess there are a lot of ways that it could have been developed, through cross examination, had Mr. Benson said something differently; or through defense proof, there had been proof to present to support a suggestion that Mr. Wilson was acting under duress. Certainly, there could have been a lot of scenarios developed that would have warranted the charging of duress, but I just don't think I've heard any in the proof this week that would warrant the charge of duress. So, no, I'm not going to charge that.

The statutory defense of duress is found at Tennessee Code Annotated section 39-11-504. This section states:

(a) Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety.

-10-

Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-504(a).

In State v. Robinson, 622 S.W.2d 62 (Tenn. Crim. App. 1980), this court stated:

[I]n order to constitute a defense to the commission of other crimes the coercion or duress must not only be present, imminent, and impending, but also the danger must be continuous throughout the time the act is being committed and must be such that a defendant could not withdraw in safety. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm and there must be no reasonable opportunity to escape the compulsion without committing the crime.

State v. Robinson, 622 S.W.2d 62, 73 (Tenn. Crim. App. 1980).

Even when taking the evidence in a light most favorable to the defendant, we do not conclude that a reasonable mind could accept that the defendant was under duress. There was no evidence at any time that Mr. McCracken threatened the defendant. There were no statements in evidence such as, "Go get the car, or I will shoot you," or "Pick up the money, or I will shoot you." There was no evidence that Mr. McCracken even pointed the gun at the defendant. There was no evidence that Mr. McCracken threatened to kill the defendant if he did not drive recklessly and refuse to stop for the police. The use of a gun in the commission of an offense does not automatically make an accomplice's actions the result of duress.

In addition, we do not find any evidence that the defendant acted to prevent harm from coming to Mr. Benson. The defendant led Mr. Benson on a high speed car chase through the streets of Memphis. At times, their speed reached up to 90 miles an hour. These are not the actions of someone trying to prevent harm to a third person.

Because we cannot find evidence, even when taken in favor of the defendant, to support an instruction for duress, we affirm the actions of the trial court.

This issue is without merit.

**Consecutive Sentencing**

The defendant's final issue is that he should not have been sentenced to eight (8) years for aggravated robbery consecutive to his life sentence for first degree felony murder. "When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the

court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). However, before ordering the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles. See State v. Imfeld, 70 S.W.3d 698, 708-09 (Tenn. 2002); State v. Wilkerson, 905 S.W.2d 933, 938-39 (Tenn. 1995).

At the sentencing hearing, the trial court heard argument from counsel, but there was no testimony. The trial court first applied enhancement factors (1), the defendant has a history of previous criminal convictions,[1] and (8), a previous history of unwillingness to comply with probation.[2] The trial court then found a few mitigating factors and sentenced the defendant to eight (8) years, the minimum sentence for aggravated robbery as a Range I Standard Offender.

> The trial court then stated the following in regard to consecutive sentencing of the defendant:
> [T]he most important factor in both of them, and the only factor as to Mr. Wilson, but the most important, clearly, for purposes of my evaluation of the consecutive versus concurrent issue is No. 4, and that is that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Certainly there was little or no regard for human life and no hesitation about committing a crime to which the risk to human life was high.

---

[1] The Tennessee Legislature amended Tenn. Code Ann. § 40-35-114 July 4, 2002 to add "(1) The offense was an act of terrorism, or was related to an act of terrorism." Therefore, the addition of this subsection, bumps all the enhancement factor numbers up a number. Therefore, enhancement factor (1), referred to by the trial court, is now enhancement factor (2) and can be found at Tenn. Code Ann. § 40-35-114(2).

[2] For reasons stated in footnote 1, enhancement factor (8) is now enhancement factor (9) and can be found at Tenn. Code Ann. § 40-35-114(9).

First, with regard to the robbery, when a gun was placed in the face of the victim . . . Mr. Benson. He testified to that at some length during the trial. And [the defendant's attorney] made the statement that his client, Mr. Wilson, didn't contemplate any injury to anyone when he bent down to pick up the money. But if you're in the middle of an armed robbery, holding a man at gunpoint, and you're [sic] partner has the gun, and you go get the car and swing around, and then you get out of the car, and you lean down and you pick up the money, and all of this is unfolding before your eyes, first of all, he's criminally responsible for what occurs.

But secondly, it's obvious that you're part and parcel of this entire event that is creating a tremendous risk to the life of Mr. Benson, the victim. And he didn't stop it, and he didn't tell his co-defendant, "Put the gun down. Let's go." He didn't leave the money there. He didn't toss the keys to his co-defendant and say, "I'm walking home, and its all yours. I'm getting out of here. I've got a good job as a manager of a gas station. I don't need to be here robbing people." He didn't do any of that. He could have. It would have been easy. Mr. Benson would have appreciated it.

. . . .

By participating in this whole event, he showed absolutely no hesitation in committing this crime in which risk to human life was high.

. . . .

[W]hen you get to the issue of consecutive v. concurrent time, I think the murder case comes into play as well, and Mr. Wilson was the driver. And the testimony, as I recall, by the experts and others was that, in their expert opinion, this car actually - this car driven by the defendants pulled over and bumped the officer's car with sufficient force to cause it to swerve off the road and crash into the tree.

. . . .

And I think it's unfortunate that these two men will be as old as they are when they're eligible for parole, but that's - those were the choices they made, and these are the consequences of those choices. And I think that the law demands that any reasonable application of No. 4 would require consecutive sentencing in these cases as to both defendants.

We agree with the trial court's assessment. Clearly, the defendant was an active participant in both the aggravated robbery and the first degree felony murder. When he returned with the car to pick up Mr. McCracken, he saw the gun pointed at Mr. Benson and did nothing to prevent or stop the robbery. Instead, he helped rob Mr. Benson by picking up the money. Then, he drove the car to get away from Mr. Benson.

His actions before the police arrived clearly show that he has no regard for human life. He drove without his lights on at speeds up to 90 miles an hour. This chase occurred on public streets where innocent people could be driving. He refused to stop when the police were following him with their lights on and sirens on signaling him to stop. Most importantly, the officers who saw the

accident and the accident reconstructionist testified that is appeared as if the defendant deliberately swerved into Officer Robinson's car, causing him to run off the road. The defendant's actions while driving clearly demonstrate he has little regard for human life. Obviously, the public needs to be protected from such behavior.

We conclude that an eight-year sentence consecutive to life imprisonment with a possibility of parole is reasonably related to the severity of aggravated robbery and the first degree felony murder of an officer of the law while on duty. This sentence is necessary to protect the public from the defendant's dangerous behavior. The trial court's sentence is definitely in accord with the general sentencing principles. Therefore, we affirm the actions of the trial court.

This issue is without merit.

## Conclusion

For these reasons, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE

-14-