STATE of Tennessee, Appellee,

v.

**Terry Lee SHROPSHIRE and Arthaniel Ladle Womble, Appellants.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Aug. 25, 1993.

Permission to Appeal Denied by Supreme Court Feb. 28, 1994.

R. Chris Albright, Chattanooga, for appellant Shropshire.

Ardena J. Garth, Dist. Public Defender and William A. Dobson, Jr., Asst. Dist. Public Defender, Chattanooga, for appellant Womble.

Charles W. Burson, Atty. Gen., Jeannie Kaess, Asst. Atty. Gen. of Tennessee, Nashville, Gary D. Gerbitz, Dist. Atty. Gen., and Thomas J. Evans and J. Cris Helton, Asst. Dist. Attys. Gen., Chattanooga, for appellee.

## *OPINION*

TIPTON, Judge.

The defendants, Terry Lee Shropshire and Arthaniel Ladle Womble, appeal as of right from their convictions by a jury in the Hamilton County Criminal Court for the offense of conspiracy to possess with intent to sell or deliver three hundred grams of a substance containing cocaine, a Class A felony. Each defendant was sentenced to twenty-five years in the Department of Correction, the maximum confinement provided for a Range I, standard, Class A felon under the 1989 Sentencing Act.

Defendant Shropshire contends (1) that the trial court erred in refusing to submit the defense of entrapment to the jury, (2) that the trial court erred in refusing to allow defense counsel to argue the defense of entrapment to the jury, and (3) that the trial court erred in excluding a statement made by him to his wife as inadmissible hearsay. Defendant Womble contends (1) that the evidence was insufficient to convict him of the conspiracy, (2) that the trial court erred in admitting a purported coconspirator statement into evidence when there was no evidence, independent of the statement, to establish the conspiracy, and (3) that his maximum sentence was excessive.

Chattanooga Police Detective Gary Lomenick testified that he had an arrangement with James O. McMillian by which McMillian would involve the police when someone came to McMillian trying to buy drugs. What would occur has been called a reverse sting, in which the police would feign selling drugs to a suspect and upon the suspect's purchase or attempt to purchase the drug, the suspect would be arrested and the money or other assets seized. McMillian would receive a share of the seized assets. Lomenick testified about the events resulting in the defendants' arrest. He identified and described video and audio recordings of a meeting at a Waffle House on Brainerd Road with Shropshire and Womble. At that meeting, for the purpose of selling cocaine, Womble pulled out twenty-two thousand dollars in a brown paper sack. Shropshire told them, including Lomenick, to give the stuff to Womble.

Lomenick stated that, a week before, he met with Shropshire at Eckerd's on Brainerd Road in an undercover van. He said Womble was not present. He produced a packet of cocaine for Shropshire to test. He said that Shropshire noted that the cocaine was good, but that he did not have the money. Shropshire stated that he had people in Atlanta who could handle it and that he would get back in touch with Lomenick. Lomenick stated that these meetings were set up by McMillian.

McMillian testified about his arrangement with Lomenick. He said that George Shadwick, known as Red, helped him with the police and that the two of them would split twenty-five percent of the seized assets. He stated that he had assisted federal, Georgia, Florida and Mississippi law enforcement in a similar fashion. In fact, he acknowledged that he made most of his living by such an arrangement.

McMillian admitted that he had previously been a cocaine addict and had been convicted on various occasions for attempt to commit

larceny, several counts of theft by deception, conspiracy to commit larceny regarding drug transactions, and felonious attempt to possess drugs. He stated that he and Shadwick would pretend to be major drug dealers from Florida and try to set up stings.

McMillian testified that a crack cocaine dealer set up a meeting between him and Shropshire. He said he went with Shadwick to a house which Shropshire was remodeling and talked to Shropshire about buying 5 kilos (a kilogram equals 2.2 pounds) of coke. He said that Shropshire told him that Shropshire was in the coke business with outlets in Chattanooga and in LaFayette, Summerville, and Dalton, Georgia. McMillian stated that Shropshire said he was temporarily short of funds and could not buy the usual five or ten kilos, although he mentioned contacts in Atlanta. McMillian testified on cross-examination that Shropshire showed him crack cocaine during this meeting. The two exchanged phone numbers.

McMillian testified that Shropshire called him later wanting to look at the cocaine. McMillian got with Detective Lomenick, who had a kilo of cocaine, and they met with Shropshire at Eckerd's. He stated that Shropshire discussed quality and price and checked out the cocaine.

Later, the defendant called McMillian to say that he wanted to do business and that he had his own twenty-two thousand dollars. The meeting was to occur at the Waffle House. McMillian said that he and Shadwick met with Shropshire and that Shadwick had a transmitter provided by the police. He said that Shropshire did not want to do business at the Waffle House and suggested another location. He said that Shropshire stated that he wanted them to give the cocaine to Shropshire's nephew or cousin and "let him go on and get it out of town" because Shropshire did not want to ride with the money and the drugs. McMillian stated that Shropshire told him that this nephew or cousin did all of Shropshire's hauling. Shropshire was talked into keeping the site of the transaction at the Waffle House where the police security was in place.

McMillian testified that he asked Shropshire if the other individual, who turned out to be Womble, was with Shropshire, at which point Shropshire motioned for Womble to come around. Womble walked to the door of Lomenick's van. McMillian said, "Well, let me see the money" to Womble, who was dressed in a T-shirt and shorts. Womble pulled the money from his shorts and handed it to Shropshire, who threw it into the van. McMillian testified that Womble was looking into the van where Lomenick had the cocaine in his hand. Lomenick stated that the money should be counted and McMillian handed the money to Shadwick, who started counting it. McMillian testified that Shropshire told them to give the stuff to Womble. The arrests occurred.

On cross-examination, Shropshire sought to show, without success, that McMillian targeted Shropshire because of some inheritance received by Shropshire. McMillian denied any such knowledge and said that he met with Shropshire because he had been informed that Shropshire dealt in drugs.

Shropshire's wife, Darisa, testified that Shropshire had experienced drug problems in the past. She said she was working at the house remodeling when McMillian, Red, an African–American named Jake and another African–American arrived. She said that, afterwards, McMillian would call two to three times a day for her husband. She said that she was concerned about what was going on and ultimately told McMillian that her husband did not live there any more.

Samuel Eugene Willie Bartley testified that he, McMillian, Shadwick and a person named Darrell went to see Shropshire at the house he was remodeling. Bartley stated that Darrell had earlier introduced McMillian to him and that McMillian had asked to meet Shropshire about buying some property. He said that in the meeting with Shropshire, McMillian started asking about buying land and then asked if Shropshire was into buying drugs. Bartley stated that Shropshire replied that he was not into that business and that McMillian asked if Shropshire wanted to try the drugs McMillian had with him. Shropshire was reported to have replied, "I'm going to tell you again, I'm not into this

business. I don't want to be bothered with it and I wish you'd stop asking me about it."

Bartley testified that on the way back to Chattanooga, the people in the car used cocaine offered by McMillian. He said that the next day, McMillian asked him if he wanted to sell drugs and that he replied no. He said that McMillian asked if he could get Shropshire to buy five kilos and he refused.

On cross-examination, Bartlett stated that the first time he talked to Shropshire's attorney was on the morning of trial. He said he came to court with Shropshire. He acknowledged that Shropshire had called him late the night before and had asked him to testify. He also said that he had not talked to Shropshire about the incident any time before.

## I

### (A)

■ Shropshire's claims all relate in some fashion to the defense of entrapment. Pursuant to T.C.A. § 39–11–505, it is a defense if "law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so." Once the existence of entrapment is "fairly raised by the proof," the trial court must submit the issue to the jury under appropriate instructions, including one about any reasonable doubt on the issue requiring an acquittal. T.C.A. § 39–11–203(c) and (d). The defendant contends that the defense of entrapment was sufficiently raised and the trial court was obligated to submit the issue to the jury.

■ In response, the state contends that the requirement that the inducement come from a government agent was not shown because McMillian was not such an agent. As a preliminary matter, we note that the state makes this argument relative to its relying upon the holding in State v. Jones, 598 S.W.2d 209, 220 (Tenn.1980) that entrapment is an affirmative defense placing the burden on the defendant to prove, at least prima facie, that government inducement existed. Under the 1989 criminal code revisions, the legislature distinguished between a

general "defense" which may arise from the proof, regardless of its source, and must only create a reasonable doubt, see T.C.A. § 39–11–203, and an "affirmative defense" which must be proven by a defendant by a preponderance of the evidence. T.C.A. § 39–11–204.

■ Although the Sentencing Commission Comments to T.C.A. § 39–11–203 state that "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable," the wording of the statute goes no further than insuring that the state need not disprove the existence of a defense unless the defense is shown by the evidence to be at issue. See T.C.A. § 39–11–203(b). In this context, the evidence introduced by the state could raise the issue of defense without a defendant presenting anything and the state would then be required to disprove the existence of the defense beyond a reasonable doubt. Under T.C.A. § 39–11–505, entrapment is a general, not an affirmative, defense. Thus, to the extent Jones viewed entrapment as an affirmative defense, it is no longer applicable. Likewise, Jones should not be read to impose a burden of proof upon a defendant which is, in any fashion, greater than that needed to meet the requirements of T.C.A. § 39–11–203.

In contending that McMillian was not a government agent, the state relies upon authority noting that inducement by a private individual does not give rise to entrapment. See United States v. Cruz, 783 F.2d 1470, 1473 (9th Cir.1986), cert. denied, 476 U.S. 1174, 106 S.Ct. 2902, 90 L.Ed.2d 987; United States v. Busby, 780 F.2d 804 (9th Cir.1986); United States v. McLernon, 746 F.2d 1098, 1109 (6th Cir.1984). This proposition is sound given the rationale for the defense of entrapment. In State v. Jones, supra, our Supreme Court recognized that a basic theory giving rise to the defense is that public policy demands a purity of government and its processes which does not exist when law enforcement, in effect, manufactures the crime and the criminal as opposed to preventing the crime and apprehending the criminal. 598 S.W.2d at 216–220. Thus, a

concern for governmental misconduct is not raised by a private citizen's actions.

However, we view the state's reliance upon federal authority to be misplaced. The cases cited by the state do not involve inducement by individuals who, at the time of the inducement, were cooperating with law enforcement under a set arrangement as existed in the present case. The standing arrangement between McMillian and Detective Lomenick and other law enforcement agencies brought McMillian within the meaning of an agent of law enforcement officials as contemplated by the entrapment statute. The dangers sought to be addressed by the entrapment defense would be of singular importance under McMillian's arrangement. Without application of the defense, law enforcement officials could allow individuals who are cooperating and working with the officials to use whatever means deemed expedient to involve an individual in criminal conduct. Indeed, the fact that McMillian's payment was contingent upon seizure of drug-related assets would necessarily be more conducive to him not acting with restraint. Also, with the standing arrangement admitted by McMillian and Detective Lomenick to exist, the fact that Lomenick had no knowledge of or involvement with McMillian's methods should not insulate the government from responsibility for those methods.

However, our determination that McMillian was a government agent does not result in our concluding that the trial court's refusal to submit the issue of entrapment to the jury under appropriate instructions warrants a reversal. For Shropshire to have been entitled to the instructions, the proof must have fairly raised the issue in terms of both the governmental inducement and the defendant's unwillingness to commit a drug conspiracy.

As a starting point, a consideration of whether the issue of entrapment was fairly raised by the proof does not entail an assessment of witness credibility. It would be improper for us or the trial court to withhold a defense from the jury's consideration because of disbelief of any witness. This is because it is the function of the jury, as the trier of fact, to resolve the factual issues, including witness credibility, under appropriate instructions of the law. Any withholding of a factual issue from the jury's determination because of judicial disbelief of a witness would invade the province of the jury and impinge upon a defendant's constitutional right to trial by a jury. Thus, to determine whether a statutory defense is fairly raised by the proof so as to require its submission to the jury, a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence. Any less standard would improperly involve the court in a credibility assessment.

From Shropshire's perspective, Bartley's testimony showed that McMillian asked Shropshire if he was into buying drugs and Shropshire replied no. McMillian asked Shropshire if he wanted to try McMillian's drugs and Shropshire replied no and requested McMillian to stop asking about it. At the end of the first meeting, no criminal conduct by Shropshire occurred and, obviously, none can be viewed as induced.

Next, Shropshire's wife testified that McMillian called two to three times a day for her husband and that she ultimately told McMillian that her husband did not live there any more. She said that they kept calling.

From Bartley's testimony about the first meeting and Mrs. Shropshire's testimony about the telephone calls, Shropshire would have us conclude that a reasonable doubt existed as to McMillian inducing or persuading him to enter a cocaine conspiracy with Womble for the purpose of buying a kilo of cocaine and as to him being otherwise unwilling to enter such a conspiracy. We cannot make such a conclusion. Mrs. Shropshire did not testify that McMillian ever talked to her husband by telephone nor did she disclose if McMillian ever mentioned the subject matter of his calls. The only other evidence of the claimed inducement related to McMillian's asking the defendant, on the first occasion, if he was into buying drugs and if he wanted to try some drugs at the time of the meeting. We cannot rationally conclude that McMillian's questions and subsequent phone calls answered by Mrs. Shropshire reasonably raised the defense of entrapment. In

this regard, it would be utter speculation to view this evidence, by itself, as reasonably supporting an inference that Shropshire, because of government inducement or persuasion, conspired with Womble to buy a kilo of cocaine for the purpose of reselling it. Therefore, the trial court did not commit error in refusing to instruct the jury regarding entrapment.

**(B)**

■ In a related matter, Shropshire complains that the trial court refused to allow him to argue to the jury the defense of entrapment and the jury's right to determine the law and the facts under Article 1, Section 19 of the Tennessee Constitution. However, Tennessee courts have consistently held that trial courts should not inform a jury that it may disregard applicable law in reaching its verdict. *See State v. Taylor,* 771 S.W.2d 387, 397 (Tenn.1989), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 799 (1990); *Janow v. State,* 567 S.W.2d 483, 485 (Tenn. Crim.App.1978). Upon an appropriate determination that the evidence does not fairly raise a defense, a trial court cannot be held in error for prohibiting a defendant from advising a jury not to follow the law as the trial court instructs it.

**(C)**

■ Finally, Shropshire complains about the trial court's failure to allow his wife to testify about his purported statement to her about his promise, after his first trouble with drugs, never to become involved with drugs again. He contends that this testimony was for the purpose of showing the defendant's existing state of mind in the context of his predisposition to commit the offense on trial. As the state points out, the defendant cites no authority to support his argument, a circumstance which results in the issue being treated as waived. Tenn.Crim.App.R. 10(b); *State v. Galloway,* 696 S.W.2d 364, 368 (Tenn.Crim.App.1985). Also, we note that there was no proof as to when the conversation occurred relative to the offense in this case in order for us to determine the extent of its relevance. In any event, even if the statement were viewed as relevant to Shrop-

shire's predisposition to commit the crime of conspiracy, the trial court's exclusion of it was harmless given the lack of evidence to show the government induced or persuaded him to commit the crime.

**II**

**(A)**

■ In contesting the sufficiency of the evidence, Womble argues that there was no evidence showing that he knew of the conspiracy and, with such knowledge, joined in it. He relies upon the fact that mere presence of a person in an area having drugs is not, alone, sufficient to support a finding that the person possessed drugs and the fact that a conviction may not be based solely upon conjecture, guess, or speculation. *See State v. Cooper,* 736 S.W.2d 125 (Tenn.Crim.App. 1987). Also, in support, he cites *United States v. Littrell,* 574 F.2d 828 (5th Cir.1978), in which the conviction was reversed for insufficient evidence upon the appellate court's determination that the activity in question was entirely consistent with innocent behavior and that the circumstantial evidence did not refute the innocent inferences. In *Littrell,* the evidence showed that a cocaine seller, making a deal with undercover agents, placed a telephone call to an unidentified party and said "go ahead and bring it." Littrell was seen driving to a hairstyling shop at which time the seller told the agents that "the man is here." Littrell was seen having a fleeting conversation with the seller outside the shop and going into a nearby bar. The cocaine was in the glove compartment of the car Littrell had driven. We consider the facts in *Littrell* to be distinguishable.

■ On appeal, the standard of review of the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate infer-

ences which may be drawn from it. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

The state was obligated to prove that Womble was involved in a conspiracy, which is a partnership in crime. *State v. Cook,* 749 S.W.2d 42, 44 (Tenn.Crim.App. 1987). The essence of conspiracy has always been an agreement to commit a crime. *State v. Hodgkinson,* 778 S.W.2d 54, 58 (Tenn. Crim.App.1989); *Owens v. State,* 84 Tenn. 1, 3 (1885). Obviously, a conspiracy requires a knowing involvement. However, no formal or expressed agreement is necessary and the agreement may be proved by circumstantial evidence.

> To prove a conspiracy, it is not necessary that the State show a formal agreement between the parties to do the unlawful act, but a mutual implied understanding is sufficient, although not manifested by any formal words, or by a written agreement. The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution.

*Randolph v. State,* 570 S.W.2d 869, 871 (Tenn.Crim.App.1978).

In the present case, the drug deal had been prearranged by Shropshire. He arrived at the designated area and motioned Womble to the van. Womble walked up to the open door of the van, pulled out a sack of money, and handed it to Shropshire. The packet containing over one kilo of cocaine was visible to Womble. He was present when Shropshire told the passengers of the van to give the "stuff" to Womble. Also, in the context of a conspiracy and under the particular circumstances of this case, the jury was entitled to consider Shropshire's statement at the scene about the role of his nephew or cousin in receiving and transporting the cocaine. We conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that Womble was a knowing participant in the conspiracy.

**(B)**

Womble contends that it was error to admit Shropshire's statement to McMillian about Shropshire having a nephew or cousin who would take delivery of and transport the cocaine into evidence. Specifically, he contends that the statement was hearsay as to him and that the trial court incorrectly allowed the statement into evidence without first determining that evidence independent of the statement established a conspiracy. The arguments are unavailing to Womble for several reasons.

First, the issue was waived because there was no objection at trial to the introduction of the statement into evidence. *State v. Sutton,* 562 S.W.2d 820, 825 (Tenn.1978); Tenn. R.Evid. 103(a)(1); T.R.A.P. 36(a). Second, the record reflects that the state submitted sufficient evidence of the existence of and the defendant's involvement in a conspiracy and sufficient evidence of the statement being made during and in furtherance of the conspiracy. Thus, the statement was admissible under the coconspirator exception to the hearsay rule. *See State v. Wiseman,* 643 S.W.2d 354, 365 (Tenn.Crim.App.1982); Tenn.R.Evid. 803(1.2).

**(C)**

Finally, Womble asserts that his sentence is excessive and based upon reasons not authorized by the 1989 Sentencing Act. He contends that the trial court enhanced the punishment because of its view that the cocaine was a poison the defendants planned to release upon the community and that Womble's purpose in committing the offense was to make money. Also, he contends that the trial court erred in refusing to find that he played a minor role in the commission of the offense and that his conduct neither caused or threatened serious bodily injury. *See* T.C.A. § 40–35–113(1) and (4).

Although appellate review of the length of the sentence is conducted *de novo,* the trial court's determinations are presumed to be correct. T.C.A. § 40–35–401(d). The Sentencing Commission Comments to this section provide that the defendant now has the burden of showing that the sentence imposed was improper.

In determining the appropriate sentence, the trial court is to presume that the minimum sentence is applicable, unless there are statutory enhancement factors present. T.C.A. § 40–35–210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40–35–210(d) and (e). There is no particular weight assigned to any given enhancement factor by the 1989 Sentencing Act and the "weight afforded mitigating or enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances of the case involved." *State v. Moss*, 727 S.W.2d 229, 238 (Tenn.1986). In other words, the weight given to any existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of sentencing and its findings are adequately supported by the record.

The trial court found that Womble had a previous history of criminal convictions or criminal behavior. T.C.A. § 40–35–114(1). The record reflects that in December, 1990, and, again, in February, 1991, he pled guilty to felonies regarding being an habitual violator of the Georgia motor vehicle laws. He was convicted in 1991 in Georgia for the felonious possession of cocaine, an offense occurring after the present one. The trial court found that Womble had committed the present offense while he was on bail for some of his Georgia offenses for which he was ultimately convicted. T.C.A. § 40–35–114(13). Also, the trial court found that Womble had a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. T.C.A. § 40–35–114(8). Womble does not contest the application of these factors.

As to mitigating factors, the trial court refused to find that Womble played a minor role in the commission of the offense, even though it found Shropshire to be the leader of the offense. It reasoned that Womble's involvement was more than minor under the evidence. The record supports this conclusion. As to whether or not Womble's conduct did not cause or threaten serious bodily injury, the record indicates that, contrary to Womble's contention, the trial court considered the fact that his conduct neither caused nor threatened serious bodily injury.

The comments about which Womble complains are misunderstood by him in that they were not used as separate enhancing factors. Although recognizing that Womble's conduct did not cause or threaten serious bodily injury relative to the cocaine purchase itself, the trial court gave this factor little weight when it was viewed in the context of the large quantity of the highly abused and dangerous drug involved and of the obvious intent of the defendants to profit monetarily from its sale. In fact, the trial court commented that it viewed the quantity and the profiteering aspects of the case to be much more serious than it would view cases involving addict-sellers trying to support their habit or persons of low means trying to make ends meet.

The 1989 Sentencing Act provides specific guidelines for courts in establishing an appropriate sentence. These guidelines require a trial court's consideration of the principles and purposes of sentencing, including looking at the facts and circumstances of the particular offense involved. Although the trial court may not enhance a sentence without the existence of statutory enhancement factors and must consider existing mitigating factors, it is not precluded from considering the particular facts and circumstances of the case which relate to the existing statutory factors in making its ultimate assessment of what weight to give those factors.

The record in this case adequately supports the trial court's findings regarding enhancement and mitigating factors. Further, it adequately supports the trial court's implicit conclusion that the existing mitigating factor was of insufficient weight to overcome enhancing the sentence to the maximum for a Range I, Class A felon. Under these circumstances, we conclude that Womble has failed to carry his burden to show that the sentence was improper.

In consideration of the foregoing, the judgments are affirmed.

SCOTT, P.J., and WHITE, J., concur.