IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 21, 2004 Session

## STATE OF TENNESSEE v. CALVIN GRISSETTE

**On Direct Appeal from the Criminal Court for Davidson County
No. 2002-A-568 Steve R. Dozier, Judge**

_____

**No. M2003-02061-CCA-R3-CD - Filed September 2, 2004**
_____

A Davidson County jury convicted the Defendant, Calvin Grissette, of second degree murder and attempted second degree murder. On appeal, the Defendant contends that the trial court erred when it refused to instruct the jury on self-defense. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, and NORMA MCGEE OGLE, JJ., joined.

Robert L. Marlow, Shelbyville, Tennessee, for the appellant, Calvin Grissette.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson III, District Attorney General; Amy Eisenbeck and Pamela Anderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from the murder of Kenneth Battle and the shooting of Michael M. Mimms, Jr., in Nashville on October 24, 2001. The Davidson County Grand Jury indicted the Defendant on one count of first degree murder and one count of attempted first degree murder. A jury convicted the Defendant of the lesser-included offenses of second degree murder and attempted second degree murder. The Defendant now appeals, arguing as his sole issue that the trial court erred by refusing to instruct the jury on self-defense.

The following evidence was presented at the Defendant's trial. Yannick Deslauriers, an officer with the Metropolitan Police Department, testified that, in the early morning hours of October

1

24, 2001, he responded to a call from dispatch regarding "shots fired" in the Edgehill area of Nashville. Officer Deslauriers stated that, when he arrived at the scene, he found one of the victims, Kenneth Battle, lying on the ground, and the victim appeared to be dead. The officer stated that he did not find a gun at the crime scene, but did interview a witness to the shooting, Chereta Jones. Officer Deslauriers estimated that less than two minutes elapsed between dispatch's announcement of the shooting and his arrival on the scene.

Mikell Wiggs, an officer with the Metropolitan Police Department, testified that he was dispatched to the Edgehill area in the early morning hours of October 24, 2001. Officer Wiggs testified that, upon arriving at the scene, he heard people shouting, "He's back here," to indicate to him where one of the victims was located. The officer explained that, one of the victims, Battle, appeared "dead" and was lying on the ground when he arrived. Officer Wiggs testified that he ordered another officer to put up crime scene tape around the victim's body. He stated that he did not find a gun at the crime scene, though he did find several shell casings near Battle's head.

On cross-examination, Officer Wiggs explained that, in his experience, evidence was sometimes removed from crime scenes. The officer stated that the police later found "a bag of dope" underneath the victim's body. Officer Wiggs estimated that between two and five minutes elapsed between the time of the dispatch call and the time that he arrived on the scene.

James Dobbins testified that he knew the Defendant, though not well. Dobbins stated that on October 24, 2001, he was watching a dice game in front of an Edgehill home with about ten other people, including Chereta Jones. According to Dobbins, when the dice game ended, he heard Battle's voice coming from around the corner of the building, and he saw the Defendant walk in Battle's direction. Dobbins testified that he witnessed the Defendant shoot Battle several times. Dobbins further stated that no words were exchanged between Battle and the Defendant prior to the shooting. Dobbins testified that he wrapped Battle in towels to prevent him from bleeding to death. He said that Battle did not have a gun.

On cross-examination, Dobbins stated that Battle talked about having guns but did not carry a gun. Dobbins stated that the Defendant walked quickly down the sidewalk toward Battle immediately before the shooting. He stated that Battle did not raise his hand or make any other motion that might indicate that he had a gun.

E. J. Bernard, a detective in the Homicide Division of the Metropolitan Police Department, testified that he was dispatched to the homicide scene after Battle had been transported to Vanderbilt Hospital. Detective Bernard stated that, at the crime scene, he saw "what appeared to be approximately five or six forty-five caliber shell casings, [what] looked like a black hat, possibly a stocking cap of some type, and a white, rocky, powdery stuff that appeared to be cocaine in a plastic bag." He explained that Chereta Jones was a witness to the shooting and that she identified the Defendant as the shooter in a photo lineup of approximately four hundred pictures.

Chereta Jones testified that Battle, the deceased victim, was her son's father. She testified

that, at about 3:00 a.m. on October 24, 2001, she was in front of a house in Edgehill watching a dice game with several other individuals when she saw the Defendant come around the corner of the building and shoot Battle seven or eight times. Jones stated that she could not see who shot Battle until the shooter began to run away, at which point she recognized the Defendant as the shooter. She testified that, after the Defendant fled, she recognized Battle as the victim and called an ambulance. She said that the Defendant did not exchange any words with Battle before he started shooting. Jones estimated that the Defendant stood in the area of the dice game between five and ten minutes before Battle arrived and the Defendant shot him. She testified that there were no weapons in the area after the shooting.

On cross-examination, Jones testified that Battle had a reputation "as a robber," but maintained that he wasn't known to carry a gun. She stated that, at the time of the shooting, Battle did nothing to indicate that he might have a gun. Jones said that Battle attempted to knock the gun out of the Defendant's hand as the Defendant was shooting him. Jones stated that the building where the shooting occurred did not have an exterior light on.

Charles Freeman, a detective with the Homicide Division of the Metropolitan Police Department, testified that, when he arrived at the crime scene, two officers briefed him. Detective Freeman stated that Battle "had numerous gunshot wounds [on] the left side of his body." The detective testified that a doctor at Vanderbilt University Hospital removed a bullet from the victim's body and gave it to the detective. Detective Freeman stated that he interviewed Michael Mimms, a witness to the shooting, at the police station. The detective explained that Mimms identified the Defendant from a photo lineup as the individual who shot Battle. Detective Freeman testified that he then went to addresses used by the Defendant in the past and located the Defendant's mother, who convinced the Defendant to turn himself in and speak with the detective. Detective Freeman said that, after interviewing the Defendant at the police station, he returned to the Defendant's mother's house to search it, with the mother's permission. The detective stated that he found a hand gun in a crawl space underneath the house. Detective Freeman testified that the Defendant told him where to find the gun.

Daniel Orr, an officer with the Identification Section of the Metropolitan Police Department, testified that, on October 24, 2001, he responded to a dispatch call regarding a shooting in the Edgehill area of Nashville. Officer Orr stated that he collected evidence at the crime scene, including six bullet shell casings, a small bag of what appeared to be crack cocaine, a small paper sack and a "black toboggan hat."

Earl D. Hunter, a crime scene investigator with the Metropolitan Police Department, testified that he took photographs of the gun found at the Defendant's mother's home, the opening to the crawl space where the gun was found, and the exterior of the home. Officer Hunter stated that, when he found the gun, its magazine was empty.

Michael Mimms testified that he was eighteen years old and that he had been a friend of Battle, the deceased victim. Mimms testified that, in the early morning hours of October 24, 2001,

he was at his home with a few friends, including Battle, smoking and playing video games. Mimms testified that he and his friends began to get bored and decided to make some money by selling cocaine. Mimms stated that he and Battle shared a cigarette outside the building. Mimms testified that their mood was jovial and that they were "just . . . chilling." Mimms said that he and Battle went to watch the dice game that was being played on the other side of the building. Mimms stated that, as he and Battle approached the game, they were talking with one another. He explained that, as they approached the corner of the building, "it got pretty quiet," and the Defendant "stepped out and started shooting." Mimms stated that the Defendant was wearing dark clothing, a coat, and a stocking cap over his head, with his face still visible. Mimms testified that the Defendant fired the gun from a range of five or six feet and said nothing before or during the shooting. Mimms stated that he saw "flames kicking out the end" of the gun as the Defendant fired it "six or seven times. My guess would be [that he used] the whole clip." Mimms testified that, as the Defendant began to fire, he ran away, but felt "a sharp little sting" in his leg. Mimms stated that he returned to his home to tell his mother what had happened when he discovered that he had been shot in the left calf. He stated that he then called the police. He testified that he identified the Defendant as the shooter from a photo lineup. Mimms stated that Battle did not have a gun with him on the night of the shooting. Mimms explained that he was approached by one of the Defendant's friends who said that he would give Mimms five or six hundred dollars if he would report that Battle was carrying a gun when the shooting occurred. Mimms said that, after being bribed by the Defendant's friend, he told a private investigator that Battle was carrying a gun on the night of the shooting, though he told the investigator that Battle did not "pull it out." Mimms testified that he subsequently told the truth at the preliminary hearing when he stated that Battle did not have a gun.

On cross-examination, Mimms stated that Battle did not own a gun but that he knew Battle occasionally carried a gun. Mimms testified that, just prior to the shooting, the Defendant "had to be watching us the whole time because he anticipated our every move because we didn't know he was there, but he knew we [were] coming."

Kendall Jaeger, a firearm and tool mark examiner with the Metropolitan Police Department, testified as an expert in the field of firearm and tool mark identification. Jaeger testified that he inspected the gun that police officers found under the Defendant's mother's house. He stated that the gun was a forty-five caliber semi-automatic Colt firearm. Jaeger testified that the gun's magazine held seven rounds. He stated that the gun would not fire unless the safety had been disengaged and that the gun would fire only once for each pull of the trigger. Jaeger also stated that the trigger on the gun had a pull weight of just over nine pounds. He explained that the gun would eject each spent casing as soon it was used out the right side of the gun, but that fact would not guarantee the position in which a given spent casing would land relative to the gun. Jaeger stated that, according to his analysis, the spent casings found at the crime scene came from the gun found in the crawl space under the Defendant's mother's home, and the bullets extracted from Battle's body were fired from the gun.

Dr. John E. Gerber, an expert in forensic pathology, testified that he performed an autopsy on Battle on October 24, 2001. Dr. Gerber stated that he found multiple gunshot wounds on the

4

body. The doctor said that the body had bullet wounds to the left back of the neck, the left side of the mid-back, the left side of the chest, and the left arm. Dr. Gerber stated that there was also an abrasion on the right eyebrow, consistent with a fall. The doctor testified that the bullets' paths through Battle's body indicated a general left to right direction. He explained that Battle had cocaine in his system when he died.

The Defendant called Bobby Brown, a licensed private investigator and paralegal, to testify. Brown testified that he had been involved in the investigation of the Defendant's case "from the start." Brown testified that he did not offer Michael Mimms any money to make a statement about Battle. On cross-examination, Brown testified that the person who put him in touch with Michael Mimms was Thomas Thompson. He stated that he was not present during every conversation Thompson had with Mimms.

Following the presentation of evidence, closing arguments, and jury instructions, the jury returned a verdict of guilty on the lesser-included offenses of second-degree murder and attempted second-degree murder.

## II. Analysis

On appeal, the Defendant contends that the trial court erred by refusing his request for a jury instruction on self-defense. The Defendant claims that the cumulative effect of testimony regarding Battle's reputation as a robber and the alleged inconsistencies between crime scene photographs and testimony regarding the location of the shooting fairly raised the issue of self-defense. The State contends that the evidence shows that there was no attempt by the victim to cause immediate harm to the Defendant prior to the shooting. Thus, the State asserts that the issue of self-defense was not raised by the proof, and the trial court properly denied the Defendant's request for a self-defense instruction. We agree with the State.

After the evidence was presented, the Defendant's counsel requested that the trial court instruct the jury on self-defense. The trial court denied the request, making the following findings:

So, I think to charge self-defense would be . . . I mean, there is nothing the jury has to evaluate that on. I mean, all the proof . . . from these witnesses is that there were no words, no argument, just an immediate shooting when Mr. Battle approached this dice game. So, I'll deny the request to charge that particular defense.

Generally, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). It is well established that mixed questions of law and fact are subject to de novo review with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001); State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). Because questions of the propriety of jury instructions are mixed questions of law and fact, our standard of review here is de novo, with no presumption

5

of correctness.

A defendant is only entitled to a defense jury instruction where the issue is fairly raised by the evidence. Tenn. Code Ann. § 39-11-203(c) (2003). In determining whether a defense is fairly raised by the evidence, a court considers "the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence." State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998) (quoting State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993)). "This is because it would be improper for a court to withhold a defense from the jury's consideration because of judicial questioning of any witness credibility." Id.

In Tennessee, self-defense is limited to situations where force is justified. "A person is justified in . . . using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force." Tenn. Code Ann. § 39-11-611(a) (2003). The person must reasonably believe that the other's force creates "an imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-11-601(a). Moreover, the person's "conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under" this defense. Bult, 989 S.W.2d at 732.

In the case under submission, the Defendant claims that he was entitled to a self-defense jury instruction because the evidence fairly raised the issue of self-defense. The Defendant contends that the testimony of Chereta Jones and James Dobbins showed that Kenneth Battle had a reputation for robbing people with a gun. The Defendant contends that he was aware of Battle's reputation as a robber because he and Battle "were acquainted." The Defendant argues that, when he saw Battle at the dice game, he felt compelled to shoot Battle before Battle had a chance to "take any action towards the [D]efendant that could have resulted in death or serious bodily injury." The Defendant supplements his argument with the assertion that the crime scene photographs offered into evidence did not corroborate the testimony of Mimms and Jones concerning where the Defendant shot Battle.

After thoroughly reviewing the record, we conclude that the record does not support the Defendant's argument. There is no evidence in the record to show that the Defendant believed that he was about to be subjected to an imminent danger of death or serious bodily harm when Battle was walking toward the dice game. Furthermore, there is no evidence that the Defendant believed that the victim was going to rob him or that force was immediately necessary to protect against the victim's use or attempted use of unlawful force against the Defendant. No gun or other weapon was found on the victim or near the victim. No words were exchanged between the victim and the Defendant before the Defendant started shooting the victim. Mimms testified that he and Battle went to watch the dice game that was being played on the other side of the building. Mimms stated that, as he and Battle approached the game, they were talking with one another. He explained that, as he and Battle approached the corner of the building, "it got pretty quiet" and the Defendant "stepped out and started shooting." The Defendant did not testify at trial. Furthermore, the Defendant's assertion that the crime scene photographs did not corroborate the testimony of Mimms and Jones is irrelevant to the issue raised on appeal. Therefore, viewing the evidence in the light most favorable to the Defendant, including drawing all reasonable inferences flowing from that evidence,

we conclude, as the trial court did, that the issue of self-defense was not fairly raised by the evidence. Thus, we conclude that the trial court did not err by denying the Defendant's request for a self-defense instruction.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgments of the trial court are AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE