IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 25, 2010 at Knoxville

**STATE OF TENNESSEE v. PHILLIPPE ROGERS**

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2271     Seth Norman, Judge**

_____

**No. M2009-00101-CCA-R3-CD - Filed August 19, 2010**

_____

A Davidson County jury convicted the defendant of one count of conspiracy to sell 300 grams or more of cocaine, *see* T.C.A. §§ 39-17-417(a)(3), (j)(5); 39-12-103 (2003), and one count of possession with intent to sell 300 grams or more of cocaine, *see id.* § 39-17-417(a)(4), (j)(5). The defendant appeals, arguing that the evidence was insufficient to support his conviction of conspiracy to sell 300 grams or more of cocaine. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Cynthia M. Fort, Nashville, Tennessee (on appeal); and Matthew Mayo, Nashville, Tennessee (at trial), for the appellant, Phillippe Rogers.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On September 9, 2005, a Davidson County grand jury indicted the defendant for one count of conspiracy to sell 300 grams or more of cocaine and one count of possession with intent to sell 300 grams or more of cocaine. After a two-day trial, a petit jury convicted the defendant as charged. The trial court sentenced the defendant to 25 years' incarceration on each count and ordered the sentences to be served consecutively for an effective 50-year sentence as a Range II offender. The defendant appeals.

At trial, Officer Roy Michael Lee of the Metropolitan Nashville Police Department ("Metro") testified that he worked with the Interstate Interdiction Squad and was called to help the Twentieth Judicial District Drug Task Force with an expected drug delivery on November 21, 2004. He testified that the drug task force informed him "that a drug delivery was going to be made in Nashville that afternoon and they wanted somebody to stop the vehicle and take the drugs off." Officer Lee said that he followed instructions to "find a place to hide" in the "Metro Center area." He testified that he waited for a subject named Jerry Smith driving a white Lincoln Navigator to come to the Maxwell House hotel and pick up narcotics to deliver to another location later that day. He explained that the drug task force had wiretapped Mr. Smith's mobile telephone.

Officer Lee testified that he observed the Navigator with a license number matching that provided to him by the drug task force. He said that he and other officers followed the vehicle before stopping it on Interstate 24 westbound past the Old Hickory Boulevard exit. Officer Lee asked Mr. Smith to exit the vehicle and then asked Mr. Smith some questions. He stated that he also asked the defendant, the vehicle's only passenger, to exit the vehicle as well. Officer Lee testified that Mr. Smith consented to a search of the vehicle.

According to Officer Lee, he found a "small little soft-shell briefcase" that contained a small amount of marijuana and some marijuana cigarettes, of which Mr. Smith claimed ownership. Officer Lee testified that he had received information from the drug task force that additional drugs were in a black bag, but he recalled that when he found the bag it contained "computer equipment, like brand new boxes of stuff." He said that he could not find any other drugs in the vehicle, so he contacted Sergeant James McWright of the drug task force. Based on their conversation, Officer Lee took his knife and cut into one of the computer equipment boxes and discovered a "brick" of what appeared to be cocaine. He then field tested the substance, and upon confirming it was cocaine, he completed his search of the vehicle and uncovered a total of four bricks of cocaine. He testified that the bricks collectively weighed "[a] little bit over four kilograms."

Officer Lee testified that he arrested the defendant but released Mr. Smith, explaining that the drug task force wanted Mr. Smith released because his telephone was wiretapped. Officer Lee testified that during booking he unsuccessfully tried to identify fingerprints on the bricks of cocaine.

On cross-examination, Officer Lee stated that he did not speak much with the defendant because he mostly spoke with Mr. Smith, the driver of the vehicle. He said that the vehicle was registered under Mr. Smith's name and that the drug task force had wiretapped Mr. Smith's – not the defendant's – mobile telephone. Officer Lee admitted that

nothing indicated that the defendant knew anything about the drugs and acknowledged that the bag containing cocaine was found behind Mr. Smith. He also conceded that the defendant's fingerprints were not found on the bricks of cocaine or the boxes containing the drugs.

Sergeant James McWright of the drug task force testified that the drug task force began wiretapping Mr. Smith's telephone conversations on November 5, 2004, as part of a larger investigation into his drug activity. Sergeant McWright testified that on November 19, 2004, the drug task force noted calls between Mr. Smith and the defendant discussing quantities of cocaine coming from Atlanta. The calls indicated that the cocaine would be delivered on November 20; however, although the cocaine was brought to Nashville, "due to some of the other conspirators they were not able to get the money and the funds together."

Sergeant McWright presented several recordings from wiretapped telephone conversations. In the first call, the defendant left an electronic voice mail message on Mr. Smith's telephone in which he told Mr. Smith, "It's a done deal." The call was recorded at 12:36 a.m. on November 10, 2004.

In the call between Mr. Smith and Jeremiah Milan, another conspirator, recorded at 10:19 a.m. on November 20, 2004, Mr. Smith informed Mr. Milan that "ain't none come through yet," and Mr. Milan asked, "Roger and them still got them five?" Sergeant McWright explained that, based upon his experience and training, he understood "five" to mean five kilograms of cocaine.

A telephone call made at 12:44 p.m. on November 20, 2004, between the defendant and Mr. Smith was played to the jury. The defendant told Mr. Smith that he and some other men were running late but that he would call when they arrived in "a little bit."

In another call, recorded at 4:04 p.m. on the same day, Mr. Smith explained that he talked to a "dude" that was running late but was "definitely gonna be here with them nickels." Mr. Smith said that the man would call Mr. Smith that evening. Mr. Milan said that another man was "supposed to give [him] that nine" and that Mr. Milan was following the man. Mr. Milan told Mr. Smith that he "got some stuff lined up." Sergeant McWright explained that "nickel" usually refers to the number five and that he understood the call to mean five kilograms of cocaine. He also said that a "nine" refers to a "nine piece" which is nine ounces of cocaine. Sergeant McWright testified that, from his understanding, Mr. Milan was finding a "nine piece" of cocaine to suffice him until the "nickels" came in from Atlanta.

The next call was recorded at 4:22 p.m. and involved Mr. Smith and the

defendant. The defendant told Mr. Smith, "I'm gonna be over there getting me a piece of that hot chicken, probably in about 45 or 50 minutes." The defendant clarified that he would be at "the hot chicken place" and that he would contact Mr. Smith with "the angle." Sergeant McWright testified that, at this point, he and his officers believed that the men were talking about Prince's Hot Chicken. However, he discovered that while Mr. Smith thought they were meeting at Prince's Hot Chicken, the defendant believed they were meeting at Hotchickens.com, a different hot chicken restaurant.

The next calls between Mr. Smith and the defendant were recorded at 5:37 p.m. and 6:13 p.m. During the first call, the defendant told Mr. Smith that he was 15 minutes from the "chicken house," and Mr. Smith responded, "Okay, I'll be watching." During the next call the defendant told Mr. Smith that he was standing at the door, and Mr. Smith said he could not see him from the parking lot. Sergeant McWright testified that he had monitored Prince's Hot Chicken and did not observe either Mr. Smith or the defendant.

A 6:57 p.m. call between Mr. Milan and Mr. Smith reflected that Mr. Smith "didn't know if dude . . . gonna stay here or not." Mr. Milan said, "I know we can move them bastards tomorrow." Mr. Smith stated that he would not be able to "get up there" until 2:00 p.m. the following day because he had church. Mr. Smith mentioned that "the dude" from Atlanta "got four of [them]," and Mr. Milan said he would "try and line them up."

During another call between Mr. Milan and Mr. Smith at 7:25 p.m., Mr. Smith put the defendant on the telephone with Mr. Milan. The defendant told Mr. Milan that he was "sitting with all these clothes in [his] lap" and that he was "trying to see cause them dudes was pushing." The defendant stated that he was trying to "pull it together" because he had "a good situation." He asked Mr. Milan when he could "give [him] concrete." Mr. Milan responded "about 1:30." The defendant then stated that he had met with some people who were "rolling kinda heavy" and "about 65 deep." Sergeant McWright explained that he interpreted this to mean "whoever [the defendant] was getting [cocaine] from had another 65 kilos, or they could have been 65,000 in on those four." He further explained, "I interpreted it that [the defendant] had gotten four from whoever already had 65 [kilos], but the jury will have to determine which interpretation they want to believe."

The next call between Mr. Milan and Mr. Smith occurred at 10:14 p.m. In this call Mr. Smith said that he "put him in the [Maxwell House] hotel." He said, "He got some glass, got four of them." Sergeant McWright testified that "glass" referenced "high quality cocaine."

At 10:07 a.m. on Sunday, November 21, 2004, Mr. Smith and Mr. Milan had a telephone conversation wherein Mr. Smith stated that he would go to the hotel to talk to a

man after church at approximately 2:00 p.m. Mr. Milan asked, "How many is it?," and Mr. Smith responded, "Four." Mr. Milan said that he would "round them up."

At 1:10 p.m. on November 21, the defendant called Mr. Smith, and Mr. Smith informed him that he "[j]ust got out" and would "be right over."

Sergeant McWright testified that he observed Mr. Smith pull up to a hotel in a white Lincoln Navigator at 1:25 p.m. He explained that he and Sergeant Richard Hamilton set up surveillance at the Maxwell House hotel in Nashville on November 21, 2004. He testified that he spent part of his time in the parking lot and part of his time in the hotel "after [they] had learned that the individuals [they] were looking for was supposed to be staying in Room 717." He said that he waited on the seventh floor and that he observed the defendant enter Room 717. After this he went to the lobby of the hotel to wait for the defendant to exit one of the elevators.

During his surveillance of the hotel, Sergeant McWright received reports of the above-described telephone calls. Officers outside the hotel informed him that Mr.Smith's Lincoln Navigator had pulled into the hotel, and Sergeant McWright observed Mr. Smith walk into the lobby and use the hotel's house telephone. He testified that Mr. Smith then walked outside the hotel and pulled his vehicle in front of the door and that the defendant exited the elevator and got into the vehicle.

Sergeant McWright followed Mr. Smith's Lincoln Navigator while maintaining radio contact with Officer Lee, who eventually stopped the vehicle. He said that he informed Officer Lee to stop the car before it left Davidson County but after passing the Old Hickory Boulevard exit on Interstate 24. He explained that Mr. Smith's passing the Old Hickory Boulevard exit indicated that he was going to Clarksville where Mr. Milan lived.

He told Officer Lee not to "burn the wire" because they wanted to continue to use the wiretapped recordings from Mr. Smith's telephone to continue their investigation. Sergeant McWright advised Officer Lee to only arrest the defendant. Sergeant McWright testified that he stayed out of sight from the traffic stop because he did not want to tip off Mr. Smith that detectives were involved.

The next call introduced to the jury was recorded from Mr. Smith's mobile telephone. The defendant used Mr. Smith's telephone to call Johnetta Smith, Mr. Smith's wife, at 1:45 p.m. The defendant told Mrs. Smith that he was Mr. Smith's partner and that they had been pulled over by police on Interstate 24 on their way toward Clarksville.

At 2:57 p.m. on November 21, Mr. Smith called Terry Rucker to inform him

that the police had arrested the defendant, who had "four of them things," but that the police did not arrest Mr. Smith.

Sergeant McWright testified that the men were exchanging each kilogram of cocaine for $22,000 or $23,000, but that the "wholesale value on them was probably between 90 and $100,000."

On cross-examination, Sergeant McWright testified that a beauty pageant and a college sorority event took place at the Maxwell House hotel during the time that he monitored the property. He testified that Mr. Smith was the primary target of his investigation and that he also "had to use" a target named Eric Davis to get to him. Sergeant McWright testified that Mr. Smith supplied cocaine to Mr. Davis and that the defendant supplied Mr. Smith.

Defense counsel asked Sergeant McWright whether he had "specific knowledge" of the defendant's knowledge of the presence of drugs in the Navigator. Sergeant McWright responded, "[M]y interpretation of what the wire said and my observations – if somebody goes to a truck and removes a bag, I think his intent is pretty clear." He admitted that he could not tell what was in the black bag containing the cocaine by looking at it. He further admitted the boxes containing the bricks of cocaine did not appear "offensive." He stated that he did not observe any suspicious behavior by the defendant in the hotel, and that, had he not known about the recorded telephone calls, he would not have noticed the defendant. He admitted that he had no experiences with the defendant previous to this investigation.

Sergeant McWright also admitted that no officers found any fingerprints on any of the cocaine or boxes. He testified that "[i]t's not surprising . . . . When the drug dealers put it in the boxes, normally they use rubber gloves." Sergeant McWright testified that he understood the defendant's saying he had "clothes in his lap" to mean drugs; however, he acknowledged that the hotel in which the defendant stayed hosted a beauty pageant and "the girls wear nice clothes."

Officer Richard Hamilton of the drug task force testified that he monitored and video recorded the Maxwell House hotel on November 21, 2004. He recalled that at approximately 1:25 p.m., he observed a white Navigator arrive at the Maxwell House hotel's front door. He testified that the driver of the vehicle went inside the hotel then returned to his vehicle after a short time. Officer Hamilton said that a second man, the defendant, then exited the hotel and got in the Navigator. Officer Hamilton testified that at 1:30 p.m., the Navigator pulled up behind a dark-colored pickup truck and that the defendant exited and approached the pickup truck. Officer Hamilton's view was obstructed as to what the

defendant did at this time. He said the defendant then "came around the front of the vehicle with a black bag in his hand and placed it in the back behind the passenger's door and then he got in the front passenger's seat and they drove away." The State introduced photographs from Officer Hamilton's cruiser showing the defendant placing the black bag in the Navigator. Officer Hamilton noted that the dark pickup truck had a Fayette County, Georgia licence plate.

Officer Hamilton testified that he and other officers stopped the pickup truck, which was operated by a man named Khalid Shabazz. He said that a search of the pickup truck produced a Walgreen's receipt reflecting a purchase made in Nashville at 11:03 p.m. on November 20, 2004; an envelope from Attorney Paul Gabbert addressed to the defendant; "some type of drive-out tag, August 29th of 2000, from South Lake Ford" in Jonesboro, Georgia; a map of Atlanta, Georgia; an atlas; a bank overdraft statement, a collections bill, and a "warranty notification card" addressed to a Joshua Rabia in Fairbanks, Georgia, which was another name used by the defendant; three mobile telephones and four travel chargers; a pager; rolling papers; an envelope containing marijuana; and a City of Los Angeles parking ticket from September 30, 2004.

On cross-examination, Officer Hamilton testified that, besides the marijuana, nothing in the truck indicated illegal activity. He admitted that he did not charge the defendant with the possession of marijuana. He also admitted that, while at the hotel, he could not determine whether anything illegal was in the bag that was placed inside the Navigator.

Officer Ed Rigsby of the drug task force testified that he originally investigated Mr. Davis which led him to investigate Mr. Smith. He testified that he reviewed the wiretapped calls on a day-to-day basis and that he personally transcribed the calls.

Officer Rigsby along with Drug Enforcement Agency ("DEA") Agent Brittle interviewed the defendant after his arrest. He stated that the defendant told the officers that Mr. Smith "set him up" and "called the Feds." The defendant told Officer Rigsby that he was in Nashville to watch his niece participate in a beauty pageant and that he only wanted to meet Mr. Smith to get some hot chicken. The defendant told Officer Rigsby that the cocaine was already in Mr. Smith's truck when he entered the vehicle. Officer Rigsby testified that the defendant originally said that he stayed in the Maxwell House hotel, but then he said that later he stayed with family in Smyrna. Officer Rigsby said that the defendant could not give a name for the niece he purported to visit.

Officer Rigsby was unable to recover the telephone with which the defendant made the wiretapped calls; however, he recovered a mobile telephone from the defendant that

had Mr. Smith's telephone number programmed into it.

Agent Glenn Everett of the TBI Crime Laboratory testified that he performed testing on the four bricks of powder substance and that they contained cocaine. He said that the aggregate weight of the blocks was 3,992 grams. Agent Everett also tested the plant material and hand-rolled cigarettes found in the Navigator. He testified that the plant material was marijuana and that the cigarettes contained both marijuana and cocaine.

Based on the information as summarized above, the jury convicted the defendant of one count of possession with intent to sell 300 grams or more of cocaine and one count of conspiracy to sell 300 grams or more of cocaine. The trial court sentenced the defendant to an effective sentence of 50 years as a Range II offender.

The defendant challenges his conviction for conspiracy to sell 300 grams or more of cocaine. We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Id.* However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"It is an offense for a defendant to knowingly . . . [s]ell a controlled substance." T.C.A. § 39-17-417(a)(3) (2003). It is a Class A felony to sell 300 grams or more of any substance containing cocaine. *Id.* § 39-17-417(j)(5). Code section 39-12-103 provides:

(a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

(b) If a person guilty of conspiracy, as defined in subsection (a), knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

(c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship.

(d) No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

*Id.* § 39-12-103(a)-(d). To prove the existence of a conspiratorial relationship, the State may rely upon a "mutual implied understanding" existing between or among the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). The conspiracy need not be proven by production of an official or formal agreement, in writing or otherwise. *Id.* The conspiracy may be demonstrated by circumstantial evidence and the deportment of the participants while undertaking illegal activity. *Id.* Conspiracy connotes harmonization of design, not coequal participation in the minutia of every criminal offense. *Id.*

The defendant only challenges his conspiracy conviction. Specifically, he argues that the records of the telephone calls were insufficient to show a conspiracy. We disagree. The recorded telephone calls made it apparent that the defendant called Mr. Smith in early November 2004 about a "done deal." Calls from November 20, 2004, reflected that the defendant tried to meet with Mr. Smith for "the angle." Later that night, Mr. Smith and Mr. Milan talked about a man from Atlanta that "got four of [them]." The defendant told Mr. Milan that he had "all these clothes in [his] lap" and wanted to know when Mr. Milan could "give [him] concrete." In another call between Mr. Smith and Mr. Milan, they stated that the

defendant "got some glass, got four of them."

The following day, Mr. Smith called the defendant to tell him he was coming to see the defendant.  Fifteen minutes after the call, officers observed Mr. Smith pull up to the Maxwell House hotel and meet with the defendant, who took a black bag containing four kilograms of cocaine out of a pickup truck with Georgia plates and placed it in Mr. Smith's Navigator.

The evidence of the telephone calls combined with the possession of drugs by Mr. Smith and the defendant supports the jury's determining that the defendant conspired to sell the cocaine.  The jury clearly interpreted the telephone calls as the defendant's making arrangements to transfer and sell 300 grams or more of cocaine.  The defendant acted in furtherance of the conspiracy by transferring the four kilograms of cocaine, which were hidden in computer equipment boxes, to Mr. Smith's vehicle.  The jury also heard testimony that Mr. Milan lived in Clarksville and that Officer Lee specifically waited for the Navigator to pass the Old Hickory Boulevard exit because it indicated the men were taking the drugs to Mr. Milan.

We will not disturb the jury's verdict, and we affirm the defendant's conviction of conspiracy to sell 300 grams or more of cocaine.

_____
JAMES CURWOOD WITT, JR., JUDGE