# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 13, 2005

## STATE OF TENNESSEE v. ERIC FIELDS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-06193-95     J. C. McLin, Judge**

---

**No. W2004-02881-CCA-R3-CD  -  Filed January 17, 2006**

---

Following a jury trial, Defendant, Eric Fields, was convicted of the following offenses and received the following concurrent sentences: aggravated robbery of Yousef Nahhas, a Class B felony, twelve years; conspiracy to possess more than three hundred grams of cocaine with intent to sell or deliver, a Class A felony, twenty-five years; attempted second degree murder of Officer Dariet Wallace, a Class B felony, twelve years; aggravated robbery of Officer Wallace, a Class B felony, twelve years; and unlawful possession of a handgun, a Class E felony, two years.  The trial court sentenced Defendant as a Range I, standard offender, for his conspiracy drug conviction, and as a Range II, multiple offender, for his remaining convictions.  The convictions were the result of a jury trial, and the total effective sentence of twenty-five years was the result of a negotiated agreement of the parties done in lieu of a sentencing determination by the trial court.  In his appeal, Defendant challenges the sufficiency of the convicting evidence.  After review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed

THOMAS T. WOODALL, J., delivered the  opinion of the  court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

Robert Wilson Jones, District Public Defender; Tony N. Brayton, Assistant Public Defender; Amy Mayne, Assistant Public Defender; and Robert Gowan, Assistant Public Defender, Memphis, Tennessee, for the appellant, Eric Fields.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; James Lammey, Assistant District Attorney General; and Vanessa King, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Muhammad Elamin testified that, on February 19, 2002, he was sitting in a car with Cortez Thomas and Mario Fields at a Phillips 66 gas station in Memphis when a man, later identified as Mr. Nahhas, approached them asking if they wanted to buy some cocaine. Mr. Thomas asked Mr. Nahhas about the quantity of cocaine he had for sale, and Mr. Elamin said that Mr. Nahhas told them that he had about three kilograms. Mr. Thomas exchanged telephone numbers with Mr. Nahhas, and Mr. Elamin and his companions left the gas station. While they were driving, Mr. Elamin said that Mr. Thomas told them that "he was going to take the cocaine." Defendant, who is Mario Fields' brother, was not with the men at this time.

Mr. Elamin said that Mr. Thomas and Mr. Fields picked him up around 7:00 p.m. the following evening. Mr. Thomas then picked up Defendant, and the group rode around for a while listening to music. Mr. Thomas received a call from Mr. Nahhas, and Mr. Thomas arranged to meet Mr. Nahhas at the front desk of the Baymont Inn. Mr. Thomas told Mr. Elamin to drive the car, and he and Mr. Fields would meet Mr. Nahhas to complete the transaction. Mr. Thomas told Defendant to wait in the car for five minutes, and then to come to Room 310, Mr. Nahhas' motel room. Mr. Elamin said that all of the men but him were armed. He did not notice what type of weapon Mr. Fields was carrying, but Defendant had a 9-mm pistol, and Mr. Thomas was armed with a revolver. Mr. Thomas was driving a green Toyota Camry.

Mr. Elamin said that he parked Mr. Thomas's Camry at the Baymont Inn, and he and Defendant waited in the car while Mr. Thomas and Mr. Fields went inside the motel. A car pulled in behind the Camry, blocking their exit. Mr. Elamin said he got out and asked the driver to move his car. The man told him to wait. Mr. Elamin said the man reached for a gun, and Defendant opened fire. Mr. Elamin ran into a nearby field where he was apprehended by police officers a short time later. Mr. Elamin said he heard about ten gun shots fired in the motel's parking lot.

Officer Dariet Wallace testified that the Memphis Police Department set up a reverse sting operation during which Mr. Nahhas volunteered to act as the seller of the cocaine. Officer Wallace parked his green Mitsubishi Galant at the Ramada Inn across the street from the Baymont Inn. Lieutenant Henry Williams radioed him that contact had been made with the suspects. Shortly thereafter, a man ran out of the motel and into the street where he was struck by a truck. Officer Wallace drove across the street to the Baymont Inn and pulled his vehicle in behind the Camry. He got out and told Defendant and Mr. Elamin that he was with the Memphis Police Department's vice and narcotics unit. Officer Wallace said that Defendant brought his weapon up and started firing. Officer Wallace returned fire and moved for cover against the building. Officer Wallace said he left the key in the ignition and the motor running when he exited his car. Defendant got into Officer Wallace's car and drove off.

Officer Patrick Fox was in charge of procuring three kilograms of cocaine for the reverse sting operation. He gave the cocaine to Lieutenant Williams who, in turn, gave the drugs to Mr. Nahhas. Mr. Nahhas was located in Room 310, and police officers occupied Room 308. Officer Fox said he was assigned to apprehend any suspects leaving or entering Room 310 once the transaction was in progress. He heard a commotion in Room 310, and the other police officers rushed in. Officer Fox heard two gunshots, and one of the suspects ran from the room. Officer Fox said that he drew his weapon, and the suspect dropped his gun but continued running. Officer Fox chased the man out of the motel. The man was taken into custody after he was struck by a truck when he attempted to cross the street. Officer Fox said he saw Officer Wallace's Mitsubishi leave the motel's parking lot. He saw muzzle flash coming from the vehicle, and he fired on the vehicle as it sped away. Officer Felipe Boyce also saw the driver of the Mitsubishi fire his weapon, and he too returned fire.

Officer Troy Berry found a revolver in the hallway between Rooms 312 and 311. In Room 310, he found one brick of cocaine on the floor and two bricks of cocaine on top of the bathroom vanity. A 9-mm pistol was found under the sink in Room 310. Officer Gerald Paige found a 9-mm pistol behind the Camry in the motel's parking lot, and three 9-mm spent casings outside the Camry's front passenger's door. The State entered a stipulation, agreed to by Defendant, that the three 9-mm shell casings were fired by the pistol found next to the Camry.

Mr. Nahhas said that he was using the public telephone at a Phillips 66 gas station when a car drove up. A man rolled down his car window and told him that he (Mr. Nahhas) did not need to make a telephone call because he (the man) had drugs for sale. The man showed Mr. Nahhas a bag filled with cocaine. Mr. Nahhas told the man that he did not need to buy any drugs because he sold drugs. Mr. Nahhas said that he told the man he sold drugs so that the man would leave. The man asked him how much cocaine he had, and Mr. Nahhas told him eleven kilograms. A second car pulled up, and Mr. Nahhas got back into his truck. Mr. Nahhas identified Mr. Thomas and Mr. Mario Fields as two of the occupants of the first car.

Mr. Nahhas left the gas station, and the two cars followed him. One of the cars got in front of him and motioned for him to pull over. Mr. Nahhas pulled into an Amoco station and rolled down his window. One of the men asked Mr. Nahhas to follow them so that the man could buy Mr. Nahhas' cocaine. Mr. Nahhas said that he told the man that he had already arranged to sell the cocaine to someone else, but he would call him if the sale did not go through. The man told Mr. Nahhas that he and his friends were members of the golden teeth gang, and their area of control was north of the 240 Loop on Lamar Avenue. The man showed Mr. Nahhas a bag of money and asked Mr. Nahhas for this telephone number. Mr. Nahhas said he did not have a telephone number, and the man wrote two numbers on a scrap of paper and handed it to Mr. Nahhas. Mr. Nahhas drove away, and the cars did not follow him.

Mr. Nahhas recorded the license tag numbers of the two vehicles and called Lieutenant Williams with the information about the proposed drug transaction. Mr. Nahhas said that he had previously worked with Lieutenant Williams, and he volunteered to pose as an out-of-town drug

seller. Mr. Nahhas called one of the telephone numbers on the scrap of paper and arranged a meeting at the Baymont Inn. Lieutenant Williams equipped Room 310 with an audio and video tape recorder and stationed his men in Room 308. Mr. Nahhas waited for the men in front of the motel. When they walked up, the men told Mr. Nahhas they were not armed, and one of the men pulled up his shirt. Mr. Nahhas said that he noticed that the men had their hands in their pockets but assumed that they were carrying cash.

One of the men searched Room 310 when Mr. Nahhas and the other men first arrived, while the other man made sure the adjoining door was locked. Mr. Nahhas said that he asked the men if they had brought scales with them to weigh the cocaine, and the men drew out their weapons. The men asked him where he had hidden the drugs, and Mr. Nahhas pointed to the mattress. One of the men told Mr. Nahhas to get on the floor because he was going to kill him. Mr. Nahhas laid down on the floor. Police officers entered the room, and Mr. Nahhas heard about eight gunshots. One of the suspects was killed at the scene. During his testimony, Mr. Nahhas did not identify which of the men played what role during the incident, but he identified Mr. Thomas and Mr. Fields as the two assailants. Mr. Elamin testified that Mario Fields and Adonis Thomas went up to the room, and other proof showed that Adonis Thomas was the one that was killed.

Officer Eric Hutchison responded to a call from Methodist North Hospital that a man with a gunshot wound, who was later identified as Defendant, had arrived at the emergency room. Officer Hutchison said that Defendant told him his name was Tyrone Head and that he had been shot by an unknown assailant as he got out of his car in south Memphis. Officer Hutchison said that he already knew about the shooting at the Baymont Inn. He got the address of Defendant's female companion and dispatched officers to the apartment complex.

Sergeant Scottie Dale Brannon discovered Officer Wallace's car at the address provided by Defendant's friend. The car was locked, but the engine was still running. Sergeant Brannon noticed several bullet holes in the car's exterior frame. Donna Nelson, a forensic scientist with the T.B.I., performed a DNA analysis on a blood stain found on the Mitsubishi's driver's seat, and she testified that the DNA sample matched the sample taken from Defendant.

Jenny Rebecca Felice and Carl Williams were watching television when Defendant arrived at Ms. Felice's apartment at 5706 Tangle Oaks Drive looking for Ms. Felice's roommate, Nefisa. Nefisa was not home, and Defendant asked Mr. Williams to drive him to the hospital. Ms. Felice said that she heard Defendant tell Mr. Williams that he had been shot in "a deal gone bad." Ms. Felice called Nefisa, and the four of them drove to the hospital after Nefisa arrived at Ms. Felice's apartment.

## II.  Sufficiency of the Evidence

### A.  Standard of Review

In examining whether the evidence is sufficient to support Defendant's convictions, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979).  Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt.  *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991).  The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence.  *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State.  *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

### B.  Aggravated Robbery

Defendant argues that the evidence was insufficient to support his conviction of the aggravated robbery of Mr. Nahhas because there was no evidence that either Mr. Fields or Mr. Thomas actually took possession of the cocaine in Mr. Nahhas' room.

The offense of robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a).  A robbery is elevated to aggravated robbery if the offense is accomplished with a deadly weapon.  *Id.* § 39-13-402(a)(1).

The State pursued Defendant's conviction of aggravated robbery under a theory of criminal responsibility.  Criminal responsibility is not a separate offense but "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based on the conduct of another person."  *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).  A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]"  Tenn. Code Ann. § 39-11-402(2).  "This Court has noted that, under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred."  *State v. Mickens*, 123 S.W.3d 355, 390 (Tenn. Crim. App. 2003).  It is not necessary that the defendant take a physical part in the commission of the crime; "[m]ere encouragement of the principal will suffice."  *Id.* (citing *State v. Ball*, 973 S.W.2d

288, 293 (Tenn. Crim. App. 1998); *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982)). To be criminally responsible, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

Applying these principles, we conclude that the evidence is sufficient to support Defendant's conviction of aggravated robbery under a theory of criminal responsibility. Prior to the drug transaction, Mr. Thomas picked Defendant up and drove the group to the designated location of the drug transaction. Mr. Thomas told Defendant to wait in the car for about five minutes, and then come to Mr. Nahhas' motel room. All three men were armed. The circumstances surrounding the offense, both before and after its commission, are sufficient to support a finding the Defendant was criminally responsible for Mr. Fields' and Mr. Thomas' actions in Room 310.

Defendant contends that Mr. Nahhas was not robbed by Mr. Fields and Mr. Thomas because there was no evidence that either man actually took possession of the cocaine before the police officers intervened. Viewing the evidence in a light most favorable to the State, Officer Fox testified that he delivered approximately three kilograms of cocaine to Lieutenant Williams who, in turn, gave the cocaine to Mr. Nahhas in Room 310. Mr. Nahhas said that he indicated to Mr. Fields and Mr. Thomas that the cocaine was under the mattress after the men drew their weapons. Police officers intervened. Officer Fox testified that he was in the hallway when one of the suspects fled Room 310 and dropped his revolver between Rooms 311 and 312. Officer Fox also testified that he found one brick of cocaine on the floor near the bathroom door and two bricks of cocaine on the bathroom vanity in Room 310 after the suspect fled. Based on the foregoing, the evidence is sufficient to support a rational trier of fact's finding that Mr. Nahhas was robbed at gunpoint, and that the robbers took possession of the cocaine that was hidden under the mattress in Mr. Nahhas' motel room. Defendant is not entitled to relief on this issue.

## C. Conspiracy to Possess Cocaine

Defendant argues that the evidence was insufficient to support his conviction of conspiracy to possess more than three hundred grams of cocaine because he was not with Mr. Thomas, Mr. Fields and Mr. Elamin when they first encountered Mr. Nahhas. Furthermore, although Mr. Elamin testified that Mr. Thomas and Mr. Fields discussed taking the cocaine on February 19, 2002, there was no evidence that these plans were discussed after Mr. Thomas picked Defendant up the following evening.

Conspiracy requires that "two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." Tenn. Code Ann. § 39-12-103(a). Some overt act in the pursuance of the conspiracy must be proved to have been done by the defendant or another

member of the conspiracy. *Id*. § 39-12-103(d); *State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999).

To prove the existence of a conspiratorial relationship, the State may show that a "mutual implied understanding" existed between the parties. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). A formal agreement is not necessary. *Id.* The conspiracy may be demonstrated by circumstantial evidence and the conduct of the parties while undertaking the illegal activity. *Id*. "'Conspiracy implies concert of design and not participation in every detail of execution.'" *Id*. (quoting *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978)).

In the instant case, the evidence showed that Mr. Thomas arranged to purchase cocaine from Mr. Nahhas, and that he told Mr. Fields and Mr. Elamin that he planned to take the cocaine. Although Defendant was not with the men at this time, Mr. Thomas picked him up the following evening before the drug transaction, and Defendant accompanied the men to the Baymont Inn where Mr. Thomas had arranged to purchase the cocaine. Defendant, Mr. Thomas and Mr. Fields were armed. Mr. Elamin testified that Mr. Thomas designated him to be the driver of the vehicle, and told Defendant to wait five or ten minutes before going to Mr. Nahhas' motel room. Defendant fired upon the police officer who attempted to block the men's escape, and then fled the scene in Officer Wallace's vehicle. In establishing Defendant's participation in the conspiracy, the State need not show that Defendant participated in every detail of the conspiracy's execution. *State v. Alcorn*, 741 S.W.2d 135, 140 (Tenn. Crim. App. 1987). Based on Mr. Elamin's testimony and Defendant's conduct before, during and after the criminal offense, we conclude that the evidence is sufficient to find Defendant guilty of conspiracy to possess more than three hundred grams of cocaine beyond a reasonable doubt.

### D. Attempted Second Degree Murder

Although not entirely clear from his brief, it appears that Defendant argues that he did not knowingly attempt to kill Officer Wallace because Officer Wallace did not identify himself as a police officer before Officer Wallace initiated the gunfire. Regardless, Defendant's issue essentially centers on the credibility of the witnesses which is properly left to the jury for resolution.

The offense of second degree murder is defined as "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-11-106(a)(20). As relevant here, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense [of second degree murder] . . . acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." *Id*. § 39-12-101(a)(2).

Intent is seldom proved by direct evidence, but may be deduced or inferred by the trier of fact from the defendant's conduct, the nature of the act, and from all of the circumstances surrounding the commission of the offense. *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing

*State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).  Mr. Elamin testified that Defendant was armed, and that Mr. Thomas told Defendant to wait five minutes and then come up to Room 310 where the drug transaction was to take place.  Officer Wallace blocked Mr. Elamin's and Defendant's exit with his car before Defendant could join Mr. Thomas and Mr. Fields.  Officer Wallace testified that he identified himself as a police officer, at which point Defendant raised his weapon and commenced firing.  Officer Wallace said that Defendant continued firing at him as he attempted to seek shelter against the side of the building.  The thrust of defense counsel's closing argument at trial was that there was only Mr. Elamin's testimony that Defendant was the one with the weapon in the parking lot, or alternatively, that Officer Wallace did not identify himself, or was not clear about his position, before Officer Wallace commenced firing.  These issues were properly reserved for the jury's resolution, and the jury obviously resolved any conflicts in the testimony or issues of the credibility of the witnesses in favor of the State's witnesses as evidenced by its verdict.

Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could find Defendant guilty of attempted second degree murder beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

We note that Defendant included a second issue in his brief in which he argues that the trial court erred in allowing Officer Eddie Perry to testify that a prospective witness, Travis Young, had escaped.  In appears that the inclusion of this issue was inadvertent because the record does not indicate that Officer Perry testified at Defendant's trial.  Nonetheless, Defendant did not present any arguments or references to the record in support of the issue, and the issue is accordingly waived. Tenn. R. Ct. Crim. App. 10; Tenn. R. App. P. 27.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE